Michael CROWE, et al., Plaintiffs,

v.

COUNTY OF SAN DIEGO,
et al., Defendants.

And Related Actions

No. 99CV0241 R(RBB).

United States District Court,
S.D. California.

Feb. 17, 2004.

Milton J Silverman, Jr., Law Offices of Milton Silverman, San Diego, CA, counsel for Crowe plaintiffs.

Robert J Francavilla, Casey, Gerry, Reed and Schenk, San Diego, CA, counsel for Treadway plaintiffs.

Dennis A Schoville, Louis Arnell, Schoville and Arnell, San Diego, CA, counsel for Houser plaintiffs.

Mark A Waggoner, City of Escondido, Office of the City Attorney, Escondido, CA, counsel for Escondido defendants.

George W Brewster, Jr., County of San Diego, Office of County Counsel, San Diego, CA, counsel for defendant Stephan.

Diana L Field, Ferguson, Praet and Sherman, Santa Ana, CA, counsel for defendants McDonough and the City of Oceanside.

Kenneth H Moreno, Scott Loeding, Murchison and Cumming, San Diego, CA, counsel for defendant Blum.

Richard J Schneider, Golnar Fozi, Daley and Heft, Solana Beach, CA, counsel for City of Escondido.

## ORDER RE: SUMMARY JUDGMENT MOTIONS

RHOADES, District Judge.

*Death is always and under all circumstances a tragedy, for if it is not, then it means that life itself has become one.*

-Letter from Theodore Roosevelt to Cecil Spring–Rice (March 12, 1900) [1]

This tragic story centers around the investigation into the death of young Stephanie Crowe in January 1998. Stephanie's murder was investigated by the Escondido Police Department. The investigation of her death initially led to the arrest and

---

1. BARTLETT'S FAMILIAR QUOTATIONS 847 (John Bartlett ed., Little, Brown & Co.1968) (1855).

indictment of Stephanie's brother, Michael Crowe, and his two friends, Michael Treadway and Aaron Houser (collectively, "the boys"), all juveniles at the time. Prior to the boys' trial, potentially-exculpatory evidence was discovered which resulted in the District Attorney dropping the charges against the boys without prejudice. Currently, a man named Richard Tuite is on trial for Stephanie's murder.

## FACTUAL BACKGROUND

On the night of January 20, 1998, the police received phone calls that Tuite, a transient, was bothering people in the vicinity of the Crowe residence. Witnesses testified at their depositions in this case that the man they saw appeared drunk or high. *See* Sharon Thomas Deposition Transcript ("DT") p. 16:22–24 (Exhibit 2, Plaintiffs' Notice of Lodgment ("NOL") in Support of Plaintiffs' Opposition to Defendant City of Escondido's Motion for Summary Judgment ("MSJ")); Sheldon Homa DT p. 17:12–15 (Exhibit 6, Plaintiffs' NOL in Support of Plaintiffs' Opposition to Defendant City of Escondido's MSJ). One witness heard Tuite yell "I'm going to kill you you fucking bitch." Sharon Thomas DT p. 18:1–6. Another witness saw Tuite spinning around in circles. *See* Dawn Homa DT p. 51:11–52:2 (Exhibit 7, Plaintiffs' NOL in Support of Plaintiffs' Opposition to Defendant City of Escondido's MSJ).

Between 7:00 and 8:00 p.m. that night, Tuite entered one house after the occupant, Dannette Mogelinski, mistaking his knock for that of a neighbor, invited him in. *See* Dannette Mogelinski DT p. 27:27–28:13 (Exhibit 3, Plaintiffs' NOL in Support of Plaintiffs' Opposition to Defendant City of Escondido's MSJ). Tuite repeatedly asked for Tracy. Mogelinski said she did not know Tracy. Tuite left but then opened the door and again asked for Tracy. Mogelinski again said she did not know Tracy, and Tuite left. *See id.* pp. 32:12–33:28.

Around 9:28 p.m., Gary West, a neighbor of the Crowes, called police to report a transient who had knocked on his door and said he was looking for a girl. *See* Exhibit 11, Plaintiffs' NOL in Support of Plaintiffs' Opposition to Defendant City of Escondido's MSJ. Escondido police officer Scott Walters, not a defendant in this action, was dispatched to the area. While investigating this call, Officer Walters drove up to the Crowe house. As he explained in his deposition in this case:

> There was a motion light above the garage door that turned on when I drove up. The door that was next to the garage door was open. And I could see inside. There were lights inside the house. Absolutely nothing unusual at the house. And the door closed as I pulled up. I couldn't see who was closing it.

Scott Walters DT p. 49:20–28 (Exhibit 15, Plaintiffs' NOL in Support of Plaintiffs' Opposition to Defendant City of Escondido's MSJ). Officer Walters left the Crowe house and indicated in his log that the transient was "gone on arrival." *See id.* p. 50:3–5. This was some time before 10:00 p.m.

Stephanie Crowe was found dead by her grandmother, Judith Kennedy around 6:30 a.m. on January 21, 1998. An autopsy determined that Stephanie was stabbed numerous times with a knife with a 5–6 inch blade. It is undisputed on this record that Stephanie died between 10:00 and 11:00 p.m. on January 20, 1998. *See* Plaintiffs' Separate Statement of Undisputed Material Facts in Opposition to Defendant City of Escondido's MSJ, Fact 17. Paramedics John Peters and Steve Mandich, not defendants in this action, were the first to respond to the 911 call. Detective Barry Sweeney, a detective with the Escondi-

do Police Department and a defendant in this action, arrived on the scene soon after.

Police questioned all of the members of the Crowe household. Michael Crowe was questioned several times. Before the first questioning of Michael Crowe, Michael was advised of his *Miranda* rights. During this questioning, Michael told Detective Mark Wrisley, a defendant in this action, and Detective Phillip Han, who is not a defendant in this action, that he had gotten up at 4:30 a.m. that morning with a headache. *See* Transcript of Police Interview of Michael Crowe Taken at The Polinsky Center, January 22, 1998 pp. 21:23–22:10. He had turned on his television for light and had walked to the kitchen, where he took some Tylenol. *See id.* pp. 22:3–23:12. Michael stated that he was in the kitchen for approximately 15 minutes. *See id.* p. 23:15–17. He stated that when he was in the hallway he could see that Stephanie's door was closed, as were the other doors. *See id.* pp. 22:28–23:5; 24:23–28. By defendants' account, the statement that Stephanie's door was closed was suspicious because by 4:30 a.m. Stephanie was dead in the doorway of her bedroom with the door open. *See* Phillip Anderson DT pp. 132:26–133:8 (Exhibit 21, Plaintiffs' NOL in Support of Plaintiffs' Opposition to Defendant City of Escondido's MSJ). During this interview, Michael Crowe also stated that Joshua Treadway was his best friend.

On January 22, 1998, Escondido Police Detectives Lanigan and Naranjo, not defendants in this case, went to the Tread-way residence to speak with Joshua Treadway. The detectives saw a knife in plain view on top of a couch in the living room. *See* Lanigan DT pp. 27:13–28:12 (Exhibit E, attached to Memorandum of Points and Authorities in Support of Escondido Defendants' MSJ or in the Alternative Partial Summary Judgment, of the Claims Asserted by the Treadway Plaintiffs). When Joshua was asked who owned the knife, he said it was his brother's; however, when his brother was questioned about the knife, he stated that it belonged to Joshua.[2] *See id.* pp. 28:13–29:27; 33:4–35:20.

After being questioned two additional times, Michael Crowe was arrested for Stephanie's murder on January 23, 1998.

On January 26, 1998 Detective Han obtained a search warrant for the Treadway residence. Probable cause for the warrant was predicated upon the fact that Michael Crowe had been arrested for the murder, Michael had stated that Joshua Treadway was his best friend, Michael had called Joshua Treadway from the police station on the morning of the murder, and a knife meeting the description of the murder weapon had been seen at the Treadway residence.

On January 27, 1998, prior to the execution of the search warrant for the Treadway residence, Margaret Houser,[3] Aaron Houser's mother, alerted police to the fact that a knife with a 4–5 inch blade which belonged to her son was missing from his collection. Based on this information, De-

---

2. There is no genuine dispute that the boys told conflicting stories. Although in the Treadways' Response to Escondido Defendants' Separate Statement of Undisputed Facts the Treadway plaintiffs state that they dispute that the boys told conflicting stories, rather than citing to evidence which demonstrates a genuine issue of fact as to whether Josh and Zachary each said that the knife belonged to the other, the Treadway plaintiffs cite generally to their Separate Statement of Facts in Opposition to Escondido Defendants' MSJ. The court has read the Treadway Plaintiffs' Separate Statement of Facts in its entirely, and there is no evidence or reference to evidence in there that would create a genuine issue of fact with respect to this point.

3. Evidence in the record, at times, refers to "Suzie" Houser. Apparently, Aaron's mother's name is Margaret Susan Houser, and she is sometimes referred to as "Suzie."

tective Han sought and obtained a warrant to search the Houser residence.[4] Defendants also questioned Aaron Houser that same day. Aaron Houser's questioning lasted approximately 1½ hours, and the focus of the questioning was on Michael's possible involvement in the murder. Aaron was asked about his friendship with Michael, his interest in fantasy games, and Michael's personality. Aaron told detectives that as far as he knew, Michael did not get along with his parents and that Michael had a "make-believe list of people he would kill." *See* Transcript of Interrogation of Aaron Houser dated 1–27–98 pp. 13:12–13; 15:10–21. Aaron was also asked about Aaron's interest in knives and about the knife that he was missing. Aaron did not make any self-incriminating statements during this interview.

The warrants for the Treadway and Houser residences were executed on the evening of January 27, 1998. While the warrant for the Treadway residence was being executed, Joshua Treadway was being questioned by police. Joshua's interrogation began around 7:00 p.m. During his questioning, the search of the Treadway residence revealed two knives under his bed. One had a 5½ inch blade, and the other had a 6 inch blade. Joshua was then arrested for stealing Aaron Houser's knife.

After being read his *Miranda* rights, Joshua admitted taking the knife from Aaron, but denied any involvement in Stephanie's death. However, over the course of further questioning, Joshua changed his story. He told defendants that he had gotten the knife from Aaron Houser and that Aaron had told him it was the knife used to kill Stephanie. Joshua's questioning ended at approximately 8:15 a.m. on January 28. Joshua was allowed to go home after the questioning.

Joshua Treadway was questioned again on February 10, 1998. This time, over the course of approximately twelve hours, Joshua gave what appeared to be a detailed account of the events leading up to the murder and stated that he had acted as a lookout while Aaron and Michael committed the murder. Joshua's confession, which was ruled voluntary by the state court trial judge, suggested that Michael killed Stephanie because he did not like her.[5] *See* Transcript of Interrogation of Joshua Treadway dated 2–10–98 p. 60:19–20 ("Well, I knew Michael hated his sister. I knew that he always had a kind of grudge against her."); p. 305:6–8 ("Well, you know, just Michael started talking how he didn't really like his sister a whole bunch and he'd really like to kill her."); p.

---

4. A less-than-careful reader might (incorrectly) believe that Detective Claytor obtained the search warrant for the Houser residence. *See* [Houser] Plaintiffs' Memorandum of Points and Authorities in Opposition to the Escondido Defendants' MSJ or in the Alternative, Partial Summary Judgment, of the Housers' Claims p. 15:18–21. However, Detective Han, who for unknown reasons is not a defendant in this lawsuit, signed the affidavit for the search warrant and executed the warrant. Defendant Claytor obtained a warrant from Judge Ramirez to search the *Crowe* home on the morning of January 21. *See* Crowe / Treadway / Houser Time Line Chart of Search and Arrest Warrants Tabs A, C, 1–3, 10 and 12.

5. These statements appeared to be somewhat corroborated by a story police found on Michael's computer regarding a boy's hatred of his angel-like sister. *See* Exhibit 19 (NOL of Exhibits in Support of Defendant Summer Stephan's MSJ/Special Motion to Strike/Request for Attorney Fees and Costs). In that story, a character named Odinwrath, who starts off wearing a blood-stained cloak, comes upon a village, where he asks where he can find his sister. A peasant tells him his sister is "in the fortress of the light," and Odinwrath stabs the peasant. Odinwrath travels to the place where his sister is. His sister appears and asks, "what do you want brother?" "Your life, sister," Odinwrath replies "with an evil glare."

358:1–2 ("Just, what I heard was Michael was always complaining about his sister.").

Joshua Treadway also told police that although he thought that Aaron and Michael were initially just joking about killing Stephanie, Aaron and Michael's plan progressed "until it became an actual thing that they had wanted to do as of the night that it happened." Id. pp. 309:28–310:4. At some point during the questioning, Joshua was arrested for Stephanie's murder.

On the morning of February 11, 1998, Detective Ralph Claytor, a defendant in this action, obtained search warrants for the residence and school locker of Aaron Houser. Those warrants were executed on the morning of February 11 by defendant Sweeney and Sergeant Phillip Anderson, also a defendant in this case.

Aaron Houser was arrested on February 11, 1998 and questioned for a second time. Aaron did not admit involvement in Stephanie's murder. However, during this questioning, Aaron explained that if he were going to kill Stephanie, the first thing he would do is tuck the knife in the back of his pants so that he could easily grab it when he needed it but so that she could not see it. He "would grab one of her arms and put it behind her back. And with the other one, I would grab and close her mouth and nose and pull her chin up. I would pull her back, let go of the arm, grab the knife and cut her throat like that." Transcript of Police Interview of Aaron Houser dated 2–11–1998 p. 100:2–8. Aaron then explained that because of the chance of getting blood on himself, he would wear sparse clothing, preferably dark clothing so the blood wouldn't show up easily, "so there is not much of a chance for blood to get on it or so that it's easy to dispose of and then find a way to get out of there and clean myself off. Destroy the evidence." Id. pp. 100:13–17; 101:10–14. Aaron said that he would not wear gloves and that afterward he would take the knife and "fire it" to destroy chemical evidence and then he would get rid of it. Id. p. 100:18–28. Aaron also stated that he would choose 2:00 or 3:00 a.m. to commit the murder because it would be less likely that anyone would be awake. Id. p. 102:7–16. He stated that he would climb through a small window "because doors can be locked and can be noisy," as can large windows. Id. p. 102:17–24. Although a small window might be "a little noisy," small windows such as bathroom windows are usually locked. Id. p. 102:20–24. Aaron proceeded to again explain the logistics of how he would hypothetically kill Stephanie, as set forth in the following colloquy:

Q. If you went into her room and you saw her, how would you approach it?

A. Well, at this time she would probably be sleeping. She was sleeping, I probably would just try to cut her throat as quickly as possible without really waking her.

Q. How would you do that?

A. If she was sleeping on her back, I would—with my left hand would cover her mouth and simultaneously slice her throat and hold it for awhile until I was sure that she was dead.

Q. And how would you know?

A. Tension in the muscles. If she was dead, they would relax. Pulse. Breathing. Eyes. If there were wide in terror. They would probably be shivering. Or they would be completely still. Again, relaxed....

Id. pp. 103:25–104:12.

In late May 1998, the grand jury issued indictments against the boys. Some time after June 1, 1998, defendant Summer Stephan took over as the assigned prosecutor. Prior to the boys' trial, drops of Stepha-

nie's blood were found on Tuite's sweatshirt. The charges against the boys were dismissed without prejudice.

After the dismissal of the charges against them, the boys and their family members filed three separate complaints in state court alleging violations of 42 U.S.C. § 1983 and various state-law torts. Defendants removed the three complaints to federal court in February 1999. On January 3, 2000, the Court issued a fifty-four page order on defendants' motions to dismiss the original complaints. In that order, the court consolidated the actions and ordered the plaintiffs to file a Joint First Amended Complaint ("JFAC").

Plaintiffs proceeded to file a JFAC consisting of 64 pages, 240 paragraphs, and 12 claims, 10 of which survived a second round of motions to dismiss. Named as defendants in the JFAC are Escondido Police Officers Claytor, Wrisley, Sweeney and Anderson (collectively "the Escondido defendants") and the City of Escondido. Also named as defendants are Lawrence Blum, a private psychologist who consulted with the Escondido Police Department during the investigation, Chris McDonough, a police officer with the City of Oceanside who participated in the interrogations of the boys, and the City of Oceanside. In addition, prosecutors Gary Hoover and Summer Stephan are also named as defendants, although plaintiffs settled with defendant Hoover prior to the entry of this order. Finally, plaintiffs named as a defendant the National Institute for Truth Verification, the manufacturer of a device, known as a "CVSA," which is marketed as a "truth verification device" and which was used during the interrogations of the boys. The court previously ruled on a motion for summary judgment brought by the National Institute for Truth Verification.

Defendants have brought a total of 10 motions for summary judgment and/or motions for partial summary judgment, which are the subject of the present order. The court has held numerous hearings and has ordered numerous supplemental briefs. The papers in this case fill 66 volumes at the clerk's office. The court has reviewed everything that has been placed before it, including approximately 40 hours of videotaped interrogations of the boys, along with videotaped interviews of Judith Kennedy and Stephen and Cheryl Crowe. The court has viewed the actual crime scene photographs as well as a videotape of the Crowe residence taken by the police after the murder. It cannot be emphasized enough that a review of all of these materials is absolutely necessary to gain a true understanding of the actual facts in this case, for certain of the parties' papers would mislead a reader who was not thoroughly familiar with the actual evidence of record. The court notes throughout this order only some of the instances where the evidence is not as it is portrayed. It is upon the court's thorough examination of the actual evidence presented, in conjunction with its exhaustive review of the applicable law, that this decision is based.

The court notes that it has attempted to analyze each claim in detail, both with respect to the factual predicates of the claim as well as with respect to the defendants named in the claim. For example, the court has separately analyzed each of the challenged arrests and searches upon which the Treadways' and Housers' Fourth Amendment claims are predicated. Similarly, the court has analyzed each of the statements uttered by defendant Stephan which plaintiffs contend were defamatory. Moreover, it has separately analyzed the liability of the individual defendants—Blum, McDonough and Sweeney—who have filed summary judgment motions contending that they did not play a sufficient role in the alleged violations to warrant the imposition of liability. The structure of the analysis

necessarily results in a certain amount of redundancy, but it is hoped that this manner of analysis will make it clear to all which claims and which defendants remain in this action as well as the reason for the court's decision.

*When reading this decision, one must keep in mind that this is a decision regarding whether defendants may be held civilly liable for the manner in which they conducted the investigation of Stephanie's murder. The court is deciding whether to grant or deny the motions for summary judgment. It is not determining who killed Stephanie Crowe, and none of the statements in this opinion should be considered a commentary regarding who may or may not be the killer.*

Finally, although the court regrets that it may seem to the parties that the decision was a longtime coming, the words of a great Chicago trial judge, Judge Prentice Marshall, have never rung more true: "Please remember that all of these papers must pass through the very small eye of a very small needle—me." [6]

## ANALYSIS

### I. First Claim for Relief—Violation of the Fourth Amendment

In their first claim for relief, plaintiffs allege that defendants Blum, Wrisley, Sweeney, Claytor, McDonough and Anderson violated their Fourth Amendment right to be free of unreasonable searches and seizures by arresting the boys and conducting searches without probable cause. The Fourth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits searches and arrests without probable cause. *Beck v. Ohio,* 379 U.S. 89, 90–91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *McKenzie v. Lamb,* 738 F.2d 1005, 1007–1008 (9th Cir.1984).

"The long-prevailing standard of probable cause protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime,' while giving 'fair leeway for enforcing law in the community's protection.'" *Maryland v. Pringle,* —— U.S. ——, ——, 124 S.Ct. 795, 798, 157 L.Ed.2d 769 (2003) (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Searches and arrests without probable cause give rise to a cause of action for damages. *See McKenzie,* 738 F.2d at 1007 (arrests without probable cause give rise to a § 1983 damages action); *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 395, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (constitutional damage action for unlawful arrest under color of federal law); *Mendocino Envtl. Ctr. v. Mendocino County,* 192 F.3d 1283 (9th Cir.1999) (§ 1983 damage action arising out of unlawful searches and seizures).

Defendants Blum, McDonough and Sweeney have each filed individual motions for summary judgment challenging the claims of all three sets of plaintiffs on the grounds that they were not sufficiently involved in the challenged searches and seizures to justify the imposition of § 1983 liability for the alleged Fourth Amendment violations. In addition, defendant Sweeney joins with defendants Wrisley, Claytor, and Anderson in seeking summary judgment with respect to the Treadways' and Housers', but not the Crowes', Fourth Amendment claims on qualified immunity grounds.

### A. Defendant Blum's Motion for Summary Judgment

■ It is undisputed that defendant Blum, a psychologist in private practice, did not physically participate in the arrests of the boys or the searches of their resi-

6. John G. Koeltl, *Brevity,* Vol. 30 No. 1 Litigation 3, 4 (Fall 2003).

dences. *See* Plaintiffs' Responses to Blum's Separate Statement of Undisputed Material Facts in Support of MSJ p. 2 ¶ 1; p. 8, ¶ 10. Rather, the Escondido defendants, who were undisputedly acting under color of state law, conducted the searches and arrests. *See King v. Massarweh*, 782 F.2d 825, 828–829 (9th Cir.1986) (plaintiffs' injuries were clearly the result of state action where state police officers conducted the arrests and searches). Where, as here, a plaintiff seeks to hold a private individual liable under § 1983 and the alleged constitutional injury is "clearly the result of state action," the relevant inquiry is not whether the private actor acted "under color of state law" but rather whether the private actor "is sufficiently connected with the clear state action in this case to have caused these acts to occur within the meaning of section 1983." *Id.* at 828–9. In other words, "[i]n order for a private individual to be liable for a § 1983 violation when a state actor commits the challenged conduct, the plaintiff must establish that the private individual was the proximate cause of the violations." *Franklin v. Fox*, 312 F.3d 423, 445–446 (9th Cir.2002).

 In order to demonstrate that a private party was the proximate cause of the plaintiff's constitutional injuries, a plaintiff must demonstrate that the private party had *control* over the state officials' decision to commit the act alleged to have violated the plaintiff's constitutional rights. *See Franklin*, 312 F.3d at 446 (" '[A]bsent some showing that a private party had some control over state officials' decision [to commit the challenged act], the private party did not proximately cause the injuries stemming from [the act].' ") (quoting *King*, 782 F.2d at 829); *see also Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1356–6 (9th Cir.1981) (private party defendants entitled to summary judgment where plaintiff presented no evidence that defendants had "some control or power over" the state actors or that the

defendants "directed" the state actors to take action against him). Here, there is absolutely no evidence that defendant Blum had any control over the other defendants' decision to conduct the challenged searches and arrests. Accordingly, as a matter of law, defendant Blum did not proximately cause any Fourth Amendment violation and thus is entitled to summary judgment with respect to the Fourth Amendment claims of all three boys.

**B. Defendant McDonough's Motion for Summary Judgment**

The following facts are undisputed:

 Defendant McDonough is a police officer with the City of Oceanside. Defendant McDonough was trained on the use of a "truth verification device" known as a "CVSA." On January 22, 1998, defendant McDonough responded to a call by the Escondido Police Department requesting that he conduct a CVSA examination on plaintiff Michael Crowe. Prior to January 22, 1998, defendant McDonough had never personally met defendants Claytor, Wrisley or Anderson and had only spoken with Barry Sweeney regarding past robbery cases. *See* Plaintiffs' Opposition to Defendant Chris McDonough's Separate Statement in Support of *Motion for Summary Adjudication/Judgment* as to All Claims Asserted by Plaintiffs Michael Crowe, Aaron Houser and Joshua Treadway p. 3, ¶ 4. This was the first time that defendant McDonough assisted another agency with the CVSA. *Id.* p. 5, ¶ 16.

Defendant McDonough questioned Michael Crowe on January 22, 1998 and utilized the CVSA device. *Id.* p. 6, ¶ 23. Afterward, defendant McDonough did not advise or recommend a course of action; specifically, he did not advise or recommend that Michael be arrested. *Id.* p. 7, ¶ 27. Defendant McDonough was not at the Escondido Police Department between January 22, 1998 and January 27, 1998.

*Id.* p. 8, ¶ 31. Defendant McDonough was not present for, nor was he consulted regarding, the January 23, 1998 questioning of Michael. *Id.* p. 8, ¶ 30. Defendant McDonough did not arrest Michael and was not present when Michael was arrested on January 23, 1998. *Id.* p. 6, ¶ 22. Defendant McDonough did not participate in a search of the Crowe property, nor did he "suggest, advise or counsel any law enforcement officer to search any portion of the Crowe property." *Id.* p. 5, ¶¶ 19, 20.

On January 28, 1998, defendant McDonough received a telephone call requesting that he assist the Escondido Police Department by administering a CVSA test on plaintiff Joshua Treadway. *Id.* p. 8, ¶ 32. At that time, Joshua had already been placed under arrest by the Escondido Police Department for stealing a knife. *Id.* p. 8, ¶ 35. Defendant McDonough did not participate in the search of the Treadway residence on January 27, 1998, nor was he consulted regarding the search. *Id.* p. 10, ¶¶ 44, 45. Defendant McDonough did not "suggest, advise, or counsel any law enforcement agency to search the Treadway residence." *Id.* p. 10, ¶ 46.

Defendant McDonough was not present when plaintiff Aaron Houser was interviewed on January 27, 1998, nor was he consulted regarding the interview of Aaron on that date. *Id.* p. 11, ¶ 49, 50.

Defendant McDonough "responded to the Escondido Police Department again on February 10, 1998" to question plaintiff Joshua Treadway. *Id.* p. 11, ¶ 51. Defendant Claytor made the decision to administer the CVSA to Joshua on February 10, 1998. *Id.* p. 11, ¶ 52. Although the reason why is disputed, it is undisputed that defendant McDonough suggested that Joshua be allowed to go home after the February 10, 1998 questioning. *Id.* p. 12, ¶ 54.

The decision to arrest plaintiff Aaron Houser was made by defendants Claytor and Anderson and another officer named Bass. *Id.* p. 12, ¶ 56. On February 11, 1998, defendant McDonough "responded to the Escondido Police Department to question Aaron Houser." *Id.* p. 12 ¶ 58. The decision to administer the CVSA to Aaron was made by defendant Claytor. *Id.* p. 13, ¶ 60. Defendant McDonough did not arrest Aaron, and Aaron was already under arrest by the time defendant McDonough arrived at the Escondido Police Department on February 11, 1998. *Id.* p. 13, ¶¶ 62, 69. Defendant McDonough did not participate in a search of the residences of Margaret Houser or Gregg Houser, and defendant McDonough did not suggest, advise or counsel any law enforcement agency to search those residences. *Id.* p. 14, ¶¶ 67, 68.

Although it is undisputed that defendant McDonough did not directly participate in the challenged arrests or searches, plaintiffs seek to hold defendant McDonough liable under a conspiracy theory. Plaintiffs speculate [7] that it was Tuite who

---

**7.** The Houser plaintiffs state that "Claytor has testified that the guy banging on all the neighbors' doors (*i.e.,* Richard Tuite) is the guy closing the Crowes' laundry room door at approximately 9:56 p.m. on January 10, 1998." Houser Plaintiffs' Memorandum of Points and Authorities in Opposition to the Escondido Defendants' MSJ or in the Alternative, Partial Summary Judgment, of the Housers' Claims p. 5:18–20. Moreover, elsewhere in their papers plaintiffs suggest that it is an undisputed fact that Tuite was the one who

killed Stephanie. *See, e.g.,* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant McDonough's MSJ of the Claims Asserted By Stephen Crowe, Cheryl Crowe, Judith Kennedy, Shannon Crowe, Margaret Susan Houser, Gregg Houser, Michael Lee Treadway and Tammy Treadway p. 3. However, as noted *supra*, Tuite is presently on trial for Stephanie's murder, and therefore it has not to date been determined who killed Stephanie. Moreover, the portions of defen-

closed the door as Officer Walters sat in his patrol car outside the Crowe residence and that had Officer Walters gotten out of his car to investigate the closing door, Stephanie's murder would have been prevented. Accordingly, plaintiffs contend that defendants entered into a conspiracy to protect Officer Walters and the Escondido Police Department from criticism. Plaintiffs alternatively characterize the conspiracy as a "scheme to blame and punish the boys,"[8] a conspiracy "to coercively interrogate, arrest and incarcerate" the boys,[9] a "conspiracy to wrongfully convict and incarcerate the boys for Stephanie's murder,"[10] and a conspiracy "to coercively interrogate, arrest and incarcerate Michael Crowe along with two of his friends, Joshua Treadway and Aaron Houser...."[11]

As Judge Posner explained in *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988), in a § 1983 constitutional-tort case, "the function of conspiracy doctrine is merely to yoke particular individuals to the specific torts charged in the complaint." To be liable based upon participation in a conspiracy, "each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir.1989) (en banc); *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir.1999). To prove a conspiracy, a plaintiff must demonstrate the existence of " 'an agreement or 'meeting of the minds' to violate constitutional rights.' " *United Steelworkers*, 865 F.2d at 1540-1 (quoting *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir.1983)). The evidence of the agreement or "meeting of the minds" must be " 'concrete.' " *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 782 (9th Cir.2001) (quoting *United Steel Workers*, 865 F.2d at 1540-1, 1543). Nonetheless, the evidence of such an agreement or "meeting of the minds" may be circumstantial rather than direct. *See Gilbrook*, 177 F.3d at 856-57 ("A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions."). For example, a showing that the alleged conspirators have committed acts that "are unlikely to have been undertaken without an agreement" may

dant Claytor's deposition transcript cited by the Housers do not support the proposition that Claytor testified that it was Tuite who Officer Walters saw closing the door. A review of defendant Claytor's deposition reveals nothing more than that defendant Claytor agreed that *if the members of the Crowe household were telling the truth*, they could not have been the ones who Officer Walters saw closing the door that night and that he has thought about the fact that it could have been Tuite who closed the door. *See* Claytor DT pp. 84:4-8; 128:27-129:8.

8. Plaintiffs' Memorandum of Points and Authorities in Opposition to Lawrence N. Blum's MSJ, or in the Alternative, Partial Summary Judgment p. 7:3-4

9. Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Chris McDonough's Motion for Summary Adjudica-

tion/Judgment as to all Claims by Michael Crowe, Aaron Houser and Joshua Treadway p. 2:12-13

10. Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Chris McDonough's Motion for Summary Adjudication/Judgment as to all Claims by Michael Crowe, Aaron Houser and Joshua Treadway p. 13:24-25.

11. Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant McDonough's MSJ of the Claims Asserted by Stephen Crowe, Cheryl Crowe, Judith Kennedy, Shannon Crowe, Margaret Susan Houser, Gregg Houser, Michael Lee Treadway and Tammy Treadway p. 3:16-19.

allow a jury to infer the existence of a conspiracy. *Kunik v. Racine County*, 946 F.2d 1574, 1580 (7th Cir.1991).

Certainly, given the extent of defendant McDonough's participation in the interrogations of the boys, a reasonable factfinder could find that there was a "meeting of the minds" between defendant McDonough and the other defendants regarding the coercion of a confession from the boys. However, to hold defendant McDonough liable under a conspiracy theory for searches and arrests which he did not direct or execute, plaintiffs must demonstrate that he shared the common objective of the larger conspiracy alleged by plaintiffs: a conspiracy to wrongfully prosecute and convict the boys. *See* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Chris McDonough's Motion for Summary Adjudication/Judgment as to all Claims by Michael Crowe, Aaron Houser and Joshua Treadway p. 13:24–25. (referring to "defendants' conspiracy to wrongfully convict and incarcerate the boys for Stephanie's murder"); *United Steelworkers*, 865 F.2d at 1541 (to be liable under a conspiracy theory, "each participant in the conspiracy need not know the exact details of the plan, *but each participant must at least share the common objective of the conspiracy*") (emphasis added).

Although, as noted *supra*, "[a] defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions," *Gilbrook*, 177 F.3d at 856–7, there is absolutely no concrete evidence, circumstantial or otherwise, from which an inference can be drawn that defendant McDonough was a member of such a broad conspiracy. Defendant McDonough did not work for the Escondido Police Department, did not have a prior personal or professional relationship with any of the defendants, was requested by the

Escondido Police Department because of his training with the CVSA device, and undisputedly did not participate in any of the searches or arrests or in any of the decisions to search or arrest.

Moreover, even if a factfinder were to find that defendant McDonough participated in the coercion of confessions from the boys, in light of all of the facts, the act of coercing a confession is not the type of act that is "unlikely to have been undertaken without an agreement" to violate the boys' constitutional rights on the larger scale alleged by plaintiffs. *Kunik*, 946 F.2d at 1580.

Because there is absolutely no basis for inferring that defendant McDonough, a police officer with the City of Oceanside, joined a conspiracy whose objective was, as alleged by plaintiffs, to wrongfully prosecute and convict the boys in order to protect the Escondido Police Department from criticism, defendant McDonough is entitled to summary judgment with respect to all of the Fourth Amendment claims asserted by plaintiffs.

## C. Defendant Sweeney's Motion for Summary Judgment

■ Defendant Sweeney moves for summary judgment with respect to the boys' claims that they were arrested in violation of the Fourth Amendment on the ground that he "did not conduct any of the interrogations that led to the arrest of" the boys and he "did not arrest any of them and was not involved in the decision to arrest them." Memorandum of Points and Authorities in Support of Defendant Barry Sweeney's MSJ or in the Alternative, Partial Summary Judgment p. 8:12–14. Similarly, he moves for summary judgment with respect to plaintiffs' claims that the searches were not supported by probable cause on the ground that he did not obtain the search warrants. *See* Memorandum of

Points and Authorities in Support of Defendant Barry Sweeney's MSJ or in the Alternative, Partial Summary Judgment p. 8:20. However, Sweeney fails to address the conspiracy allegations leveled against him. Accordingly, defendant Sweeney's individual motion for summary judgment is denied with respect to plaintiffs' Fourth Amendment claims.

### D. The Escondido Defendants' (Claytor, Wrisley, Anderson and Sweeney) Motion for Summary Judgment

The Escondido defendants move for summary judgment with respect to the Treadways' and Housers' Fourth Amendment claims on qualified immunity grounds. Curiously, with respect to the Houser plaintiffs' Fourth Amendment claims, the Escondido defendants nowhere argue that there was probable cause for Aaron Houser's arrest and the searches of the Houser residence and Aaron's locker, while with respect to the Treadway plaintiffs' claims, they give only lip service to the argument that there was probable cause for the searches and seizures. Because Supreme Court case law dictates that the first step in determining whether a defendant is entitled to qualified immunity is to determine whether there has been a constitutional violation, *see Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the court will determine whether the arrests and searches were supported by probable cause despite defendants' failure to do so. *See Doe v. Lebbos,* 348 F.3d 820, 828 (9th Cir.2003) ("We note that the parties did not brief the issue of whether Herrera's alleged actions, if proven, violated a constitutional right. We are obligated under *Saucier,* however, to address this issue at the outset of our qualified immunity analysis.").

Qualified immunity "is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Thus, "[t]he question of immunity is not to be 'routinely place[d] ... in the hands of the jury.'" *Lindsey v. Shalmy,* 29 F.3d 1382, 1384 (9th Cir.1994) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). That the issue of qualified immunity is not to be routinely placed in the hands of a jury was re-emphasized by the United States Supreme Court in *Saucier.* In that case, the Supreme Court disapproved of the Ninth Circuit's former practice of denying summary judgment "any time a material issue of fact remains" because such a practice "could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

Thus, after *Saucier,* whether a defendant is entitled to qualified immunity is a two-step inquiry. In the first step, the court considers whether a constitutional right was violated by the officer's conduct, viewing the facts regarding the officer's conduct in the light most favorable to the plaintiff. *See Graves v. City of Coeur D'Alene,* 339 F.3d 828, 846 (9th Cir.2003); *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. The second step is to determine whether the law governing the officer's conduct "'was clearly established.'" *Graves,* 339 F.3d at 846 (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151). "Whether the law was clearly established is a pure question of law for the court to decide." *Carnell v. Grimm,* 74 F.3d 977, 978 (9th Cir.1996). The clearly-established inquiry, "it is vital to note, must be undertaken in light of the

specific context of the case, *not as a broad general proposition.... "* *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151 (emphasis added). Thus, "[t]he relevant, dispositive inquiry" is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. "The inquiry is not 'whether another reasonable or more reasonable interpretation of events can be construed... after the fact.' " *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir.1996), *overruled on other grounds by* 114 F.3d 999 (9th Cir.1997) (quoting *Hunter*, 502 U.S. at 228, 112 S.Ct. 534). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151.

■ In the Fourth Amendment context, it is "inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present," and "in such cases those officials—like other officials who act in ways they reasonably believe to be lawful-should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). As the Ninth Circuit aptly noted in *Smiddy v. Varney*, 665 F.2d 261 (9th Cir.1981), "[i]t is necessary that police officers be immune when they reasonably believe that probable cause existed, even though it is subsequently concluded that it did not, because they 'cannot be expected to predict what federal judges frequently have considerable difficulty in deciding and about which they frequently differ among themselves.' " *Id.* at 266 (quoting *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339, 1349 (2d Cir. 1972) (Lumbard, J., concurring)). Thus, a police officer is entitled to qualified immunity from suit for damages arising out of a Fourth Amendment violation if a reasonable officer possessing the same facts as the defendant officer could have reasonably believed that the search or arrest was supported by probable cause even if a court later determines it was not. *See Bilbrey v. Brown*, 738 F.2d 1462, 1467 (9th Cir.1984) ("Appellees could therefore qualify for immunity from damages if they reasonably, but mistakenly, believed that they had reasonable cause or probable cause to search appellants."); *Forster v. County of Santa Barbara*, 896 F.2d 1146, 1147–1148 (9th Cir.1990) (finding an officer is "qualifiedly immune from a suit for damages... unless 'a reasonably well trained officer in [his] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant' ") (quoting *Malley v. Briggs*, 475 U.S. 335, 345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

■ Importantly, a police officer's subjective intent is irrelevant to the qualified immunity analysis. *See Anderson*, 483 U.S. at 641, 107 S.Ct. 3034 ("The relevant question in this case, for example, is the objective ... question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. Anderson's subjective beliefs about the search are irrelevant."). Moreover, for summary judgment purposes, "[t]he fact that an expert disagrees with the officer's actions does not render the officer's actions unreasonable." *See Reynolds*, 84 F.3d at 1170; *see also Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir.2002).

*1. January 26 Search of the Treadway Residence (1747 Jeffrey Avenue)*

Detective Han obtained a search warrant for a search of the Treadway residence on January 26 and executed the warrant on January 27 at approximately 8:30 p.m. The following facts were included

in the affidavit in support of the search warrant:

> Stephanie Crowe was stabbed to death. Her wounds were consistent with being stabbed with a knife with a 5–6 inch blade. Defendant Claytor told Detective Han that when he interviewed Michael Crowe on January 26, 1998, Michael Crowe said that Joshua Treadway was his best friend. Defendant Claytor told Detective Han that Michael Crowe called Joshua Treadway from the police department and told him that Stephanie's body had been found. Det. Lannigan told Detective Han that he had interviewed Joshua Treadway at his residence on January 22 and saw a knife at the residence in the living room on the couch. The knife had a black leather-wrapped handle with a hand guard and a 5–6 inch blade. Michael Crowe was arrested and charged with Stephanie's murder on January 23.[12]

■ Probable cause to search exists when, given the totality of the circumstances, it is fairly probable that contraband or evidence of a crime will be found in the place to be searched. *See United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir.1991); *see also Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) ("We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found.' ") (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The evidence must simply demonstrate a "probability" of criminal activity, not a prima facie showing, and the evidence "need not be admissible, but only legally sufficient and reliable." *Franklin*, 312 F.3d at 438.

■ Based on the fact that Michael Crowe had been arrested for Stephanie's murder, that Joshua Treadway was Michael's best friend, and that Detective Lanigan had seen a knife fitting the description of the murder weapon at the Treadway residence immediately after the murder, there was a fair probability that evidence related to the murder would be found in the Treadway home. However, the constitutionality of a search is not conclusively established simply because the facts in the affidavit in support of the warrant support a finding of probable cause. In determining whether there is probable cause to search, it is relevant whether the affidavit in support of the warrant contained material misrepresentations, be it affirmative misrepresentations or misrepresentations by omission. The issue of the materiality of alleged misrepresentations, is, at the summary judgment stage, an issue of law for the court. *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995). Affirmative misrepresentations are material, and therefore the Fourth Amendment is violated, only if there is no probable cause absent consideration of the misrepresented facts. *See Franks v. Delaware*, 438 U.S. 154, 171–2, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). A misrepresentation based on an omission is material, and therefore the Fourth Amendment is violated, only where the omitted facts " 'cast doubt on the existence of probable cause.' " *United States v. Garza*, 980 F.2d 546, 551 (9th Cir.1992) (quoting *United States v. Dennis*, 625 F.2d 782, 791 (8th Cir.1980)). However, even if a plaintiff is able to demonstrate that a warrant was issued as the result of a material misrepresentation, a police officer defendant is entitled to summary judgment on qualified immunity grounds unless the plaintiff can also dem-

---

**12.** This is not a verbatim account but rather a paraphrase of what was in the warrant application.

onstrate that the police officer deliberately falsified information presented to the magistrate or recklessly disregarded the truth. *See Hervey*, 65 F.3d at 789 (a defendant police officer is entitled to summary judgment on qualified immunity grounds unless "the plaintiff can *both* establish a substantial showing of a deliberate falsehood or reckless disregard and establish that, without the dishonestly included or omitted information, the magistrate would not have issued the warrant"). Thus, resolution of defendants' summary judgment motion requires consideration of the alleged misrepresentations identified by plaintiffs.

### (a) The Location of Stephanie's Body

■ The Treadway plaintiffs contend that the judge who issued the warrant for the search of their residence was misled about Michael Crowe's involvement in the murder, which involvement was material to the issuance of the warrant for the search of the Treadway residence. In particular, the Treadway plaintiffs argue that defendants misled the judge about Michael's involvement by failing to inform the judge about the correct position of Stephanie's body upon her death. The position of Stephanie's body was relevant to the question of whether Michael had told the police the truth when he said that he had gotten up at 4:30 a.m. to take some Tylenol for a headache and had noticed that Stephanie's bedroom door was closed. Defendants maintain that Stephanie's door was not closed at 4:30 a.m., but that, in fact, Stephanie was dead in the doorway to her bedroom with the door open, and that Michael's statement to the contrary thus directed suspicion toward him. In fact, defendant Anderson testified at his deposition that part of the reason why the Escondido defendants believed that probable cause existed to arrest Michael Crowe was that he said that the door was shut at 4:30 a.m. while defendants believed that the door was open at that time and that Ste-

phanie was lying dead in the doorway. *See* Phillip Anderson DT pp. 132:26–133:8 (Exhibit 15, Plaintiffs' NOL in Support of Plaintiffs' Opposition to Defendant City of Escondido's MSJ). Plaintiffs, however, contend that Stephanie died inside her bedroom with the door closed and that, therefore, Michael told the truth when he said that Stephanie's door was closed when he got up at 4:30 a.m. According to plaintiffs, defendants knew that Stephanie died inside her bedroom and should have presented this fact to the judge when obtaining the warrant. Plaintiffs contend that the omission of this fact in the warrant was material.

In determining the materiality of this alleged omission, the proper focus is not on the actual position of Stephanie's body but rather on the facts that defendants had in their possession regarding the position of Stephanie's body. *See Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994) ("In recognition of the endless scenarios confronting police officers in their daily regimen, courts evaluate probable cause 'not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer*—seeing what he saw, hearing what he heard.'") (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir.1992)); *see also Anderson*, 483 U.S. at 641, 107 S.Ct. 3034 (in determining whether a police officer is entitled to qualified immunity from suit for damages arising out of a search or arrest, the court must consider what facts the defendant officer possessed, and then determine whether a reasonable officer possessing the same facts as the defendant officer could have believed that the search or arrest was supported by probable cause).

On this record, it is undisputed that Stephanie died between 10:00 and 11:00

p.m. *See* Plaintiffs' Separate Statement of Undisputed Material Facts in Opposition to Defendant City of Escondido's MSJ, Fact 17. Moreover, it is undisputed that Stephanie's bedroom door opens into a small alcove directly across from Michael's bedroom door. Although a cliche it may be, the old saying "a picture is worth a thousand words" still applies. The court has viewed the crime scene photographs, and in those photographs Stephanie is lying in the doorway of her bedroom, *i.e.,* the lower half of Stephanie's body is inside the bedroom while her head is clearly outside the bedroom, and the door is very clearly open. John Peters, one of the paramedics who first arrived on the scene, testified in his deposition that he found Stephanie in the position that she is shown in the crime scene photographs. *See* Peters DT p. 48:6–8 (Exhibit M, attached to Response of Defendant Barry Sweeney to Plaintiffs' Supplemental Reference to the Evidence in Opposition to MSJ or in the Alternative, Partial Summary Judgment). Steve Mandich, another paramedic on the scene with Peters, similarly testified at his deposition that the crime scene photographs accurately reflect his memory of where he saw Stephanie's body upon his arrival.[13] *See* Mandich DT p. 49:1–19 (Exhibit N, attached to Response of Defendant Barry Sweeney to Plaintiffs' Supplemental Reference to the Evidence in Opposition to MSJ or in the Alternative, Partial Summary Judgment). It is further undisputed that defendant Sweeney arrived on the scene after Peters and Mandich, and therefore defendant Sweeney necessarily viewed Stephanie's body in the same position in which it was viewed by Peters and Mandich—in the doorway. Moreover, it is without doubt that it would be physically impossible for the door to be closed with Stephanie's body in the position reflected by the photographs, and no reasonable factfinder could possibly find otherwise. Thus, given the undisputed time of Stephanie's death, unless Stephanie's body was moved between the time that it was discovered by Judith Kennedy and the time Stephanie was viewed by Peters, Mandich and Sweeney *and defendants knew or had reason to know that the body was moved,* defendants could not have known or had reason to know that Stephanie was not lying in the doorway of her bedroom when Michael got up to go to the kitchen at 4:30 a.m. Without such knowledge, defendants cannot be held liable for basing their probable cause determination on Stephanie's body being in the doorway of her bedroom. *See Sheik–Abdi,* 37 F.3d at 1247 (explaining that the test for probable cause "is an objective one—it is 'what the police know, not whether they know the truth, that matters' ") (quoting *Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432, 439 (7th Cir.1986)).

Having carefully combed the voluminous record, the court concludes that no reasonable factfinder could find that defendants knew or had reason to know that Stephanie's body was moved and therefore was

---

**13.** Plaintiffs do not argue, nor is there any evidence suggesting, that Peters or Mandich, who are not employees of the Escondido Police Department, were involved in a conspiracy to "frame" the boys or were even aware of the event plaintiffs contend precipitated the alleged conspiracy, and there is no evidence of any other type which calls into question the credibility of Peters' or Mandich's statements regarding the location of the body. Moreover, Peters' and Mandich's deposition testimony is corroborated by a report from Peters to Captain Keck dated January 21, 1998 which relates that Stephanie was found "right recumbent on floor in bedroom doorway" and that upon Peters' arrival he "found the mother holding the patient, located in the bedroom doorway on the floor." *See* Exhibit L, Response of Defendant Barry Sweeney to Plaintiffs' Supplemental Reference to the Evidence in Opposition to MSJ or in the Alternative, Partial Summary Judgment.

not lying in the doorway at 4:30 a.m. as it was at the time the crime photos were taken. First, there is no evidence in the record suggesting that any of the members of the Crowe family moved Stephanie's body between the time it was discovered and the time that the paramedics arrived or, more importantly, that they informed defendants or anyone associated with the investigation that they had moved the body. In fact, Judith Kennedy specifically testified at her civil deposition that she did not move Stephanie's body. *See* Judith Kennedy DT p. 16:1–4 (Exhibit D, Response of Defendant Barry Sweeney to Plaintiffs' Supplemental Reference to the Evidence in Opposition to MSJ or in the Alternative, Partial Summary Judgment). Moreover, Cheryl Crowe drew a diagram of the crime scene for defendant Sweeney which a reasonable officer could interpret as showing Stephanie's body in the doorway of her bedroom with the door open. *See* Exhibit K, attached to Response of Defendant Barry Sweeney to Plaintiffs' Supplemental Reference to the Evidence in Opposition to MSJ or in the Alternative, Partial Summary Judgment.

Based upon the above facts, a reasonable factfinder could reach but one conclusion: when defendant Sweeney viewed the body, it was in the same position as when Peters and Mandich viewed the body, which was in the doorway of the bedroom, a position inconsistent with the door being closed. Accordingly, regardless of whether the door was actually open or closed at 4:30 a.m. when Michael Crowe went to the kitchen, on this record, a reasonable police officer could have believed that the door was open and that Stephanie was lying in the doorway, and, thus, a reasonable officer would have been justified in pursuing an investigation and obtaining warrants

based on this belief. *See Sheik–Abdi*, 37 F.3d at 1247 (explaining that the test for probable cause "is an objective one—it is 'what the police know, not whether they know the truth, that matters'") (quoting *Gramenos*, 797 F.2d at 439).

Plaintiffs' arguments to the contrary notwithstanding, Judith Kennedy's statements to Wrisley during her January 21 interview cannot reasonably be interpreted as putting defendants on notice that in fact the door to the bedroom was closed when Stephanie was found. Specifically, the court notes the following colloquy, which occurred between defendant Wrisley and plaintiff Kennedy:

W: When you got up due to the alarm and you went out and you found Stephanie in the doorway I guess there—

K: Uh-huh [yes] [14]

W. Did you go into her room at all?

K: No, I just stepped inside and I saw her laying there and I thought this is—something's wrong here. . . .

Having reviewed this portion of the videotape, it is clear that Kennedy did not correct defendant Wrisley when he referred to Stephanie being "in the doorway" and that Kennedy answered "no" to the question of whether she went into Stephanie's room. It is undisputed that, unlike Michael Crowe's bedroom door, Stephanie Crowe's bedroom door did not open directly into the main hallway, but opened into a small alcove that connected Stephanie's bedroom to the main hallway. Thus, it was entirely reasonable for defendant Wrisley to believe that Kennedy was referring to "stepping inside" the alcove and not Stephanie's bedroom. In addition, even assuming that Ms. Kennedy's cryptic

---

**14.** This utterance by Kennedy is not reflected in the transcript of the videotape but is clearly evident to a listener of the videotape.

statement to defendant Wrisley could be interpreted as a statement that the door was closed, this statement would have been immaterial to the judge's probable cause determination given all of the evidence regarding the position of Stephanie's body which suggested that the door was not closed and the absence of any evidence that the body had been moved.

Moreover, Judith Kennedy's later testimony at Michael's 707 hearing and at her deposition in this case that the door to Stephanie's bedroom was closed does not change the analysis. This testimony is inconsistent with her prior statements to police as well as with all of the physical evidence, and, in any event, this testimony came after the challenged searches and arrests and therefore this information was not in defendants' possession at the time of the challenged searches and arrests.

Finally, no reasonable factfinder could find that defendant Sweeney's admission in his deposition that Fire Department Captain Keck wrote a report stating that Stephanie's head was inside the doorway of her bedroom establishes that defendants knew or had reason to know that Stephanie's door was closed at 4:30 a.m. *See* Sweeney DT p. 575:3–9 (Exhibit 1, [Houser] Plaintiffs' NOL in Support of Plaintiffs' Opposition to Defendant City of Escondido's MSJ). First, plaintiffs fail to note that Sweeney also testified that Captain Keck admitted that this statement was inaccurate. Second, there is no evidence in the record suggesting that Captain Keck had first-hand knowledge of where Stephanie's body was found so that it would have been reasonable for defendants to take into account Keck's account of the position of the body. Third, there is no evidence that defendants had knowledge of Keck's report at the time of the challenged searches and arrests.

In summary, the relevant issue here is not whether Stephanie's door was open at 4:30 a.m., and nothing in this opinion is to be construed as a finding regarding the position of the door at that time. Rather, the relevant issue here is whether a reasonable police officer could have believed that the door to Stephanie's bedroom was open at 4:30 a.m. and that she was lying dead in the doorway at that time, and, thus, whether a reasonable officer could have therefore believed that Michael Crowe, who stated that the door was closed, was lying and possibly involved in Stephanie's murder. On these facts, it was entirely reasonable for defendants to believe that the door to Stephanie's room was open at 4:30 a.m. and that she was lying dead in the middle of the doorway, and no reasonable factfinder could find otherwise. Accordingly, defendants cannot be held liable for failing to inform the judge that Stephanie died in her bedroom with the door closed because, regardless of where Stephanie actually died and the actual position of the door when she died, there is no basis for concluding that defendants recklessly disregarded the truth when they pursued warrants based on the assumption that Stephanie died in her doorway with the door open and that Michael Crowe was lying about seeing the door closed at 4:30 p.m. *See Hervey,* 65 F.3d at 789 (a defendant police officer is entitled to summary judgment on qualified immunity grounds where the omission of information was not the result of a deliberate falsehood or a reckless disregard of the truth).

*(b) Tuite's "Involvement" in Stephanie's Murder*

The Treadway plaintiffs also contend that defendants omitted material information from the warrant application when they failed to include information regarding Tuite's "involvement" in Stephanie's murder. This argument fails because the only information regarding Tuite's *possi-*

*ble*[15] involvement in Stephanie's murder *which defendants possessed at the time of the challenged searched and seizures* was so speculative that this information did not negate the existence of probable cause for the challenged searches and arrests. *See United States v. Bishop*, 264 F.3d 919, 924 (9th Cir.2001) ("It is well-settled that the determination of probable cause is based upon the totality of the circumstances *known to the officers at the time of the search*.") (emphasis added); *see also Grant v. City of Long Beach*, 315 F.3d 1081, 1091 (9th Cir.2002).

When ruling on a motion for summary judgment on qualified immunity grounds, the materiality of the information in the police officer's possession is an issue for the court, and questions should be resolved in favor of the police officer. *See Lombardi v. City of El Cajon*, 117 F.3d 1117, 1126 (9th Cir.1997). As the Ninth Circuit explained in *Lombardi:*

> [P]articularly where omissions are involved, materiality may not have been clear at the time the officer decided what to include in, and what to exclude from, the affidavit. In such cases, *when it is not plain* that a neutral magistrate would not have issued the warrant, the shield of qualified immunity should not be lost, because a reasonably well-trained officer would not have known that the misstatement or omission would have any effect on issuing the warrant.

*Id.* at 1126 (emphasis added). It is undisputed that Tuite had been seen in the area on the night of the murder and that various individuals had called the police to report Tuite because he was knocking on people's doors looking for a woman named Tracy and did not appear to have any legitimate business in the area. According to some witnesses, Tuite appeared drunk or high and agitated. *See* Sharon Thomas DT p. 16: 22–24; Sheldon Homa DT p.

17:12–15. One witness saw Tuite spinning in circles. *See* Dawn Homa DT pp. 51:11–52:2 The court will assume for purposes of this motion that at all relevant times, defendants were aware of Tuite's activities on the night of the murder. Clearly, Tuite's activities in the neighborhood would not "cast doubt" on the existence of probable cause to search the Treadway residence, and therefore would not be material, without additional evidence somehow linking Tuite to the Crowe residence.

In an attempt to show such a link, plaintiffs point to the fact that Officer Walters, who again is not a defendant in this lawsuit, saw the door to the Crowe house close between 9:30 and 9:56 p.m. on the night of the murder after responding to a neighbor's call regarding Tuite. According to plaintiffs, given Tuite's activities in the neighborhood and "the known [self-reported] whereabouts of everyone in the Crowe house at that time, the only reasonable inference is that Tuite closed the laundry room door." *See* [Houser] Plaintiffs' Points and Authorities in Support of Opposition to Escondido Defendants' MSJ p. 5, n. 4. Therefore, plaintiffs contend, reasonable officers would not have sought warrants to search plaintiffs' residences (or, had they done so, would have informed the judge about Tuite's "involvement" in Stephanie's murder) and also would not have arrested the boys.

The inference that it was Tuite who was closing the door to the Crowe residence when Officer Walters saw the door closing was not necessarily the only inference a reasonable police officer or judge could draw at the time of the challenged searches and seizures. Given Tuite's behavior as described by witnesses, Tuite would not necessarily be the most likely suspect in a murder committed between

---

**15.** *See* footnote 7.

10:00 and 11:00 p.m. inside a house inhabited by six people and a dog.[16] Moreover, as set forth *supra*, the police had reason to believe that Michael had lied regarding not seeing Stephanie's body at 4:30 a.m. and therefore had no reason to focus their suspicion on Tuite. In addition, the police had seen a knife matching the description of the murder weapon in the Treadway residence. Finally, a reasonable officer investigating this murder was not required to believe the Crowe families' statements that none of them closed the door. In sum, at the time of the challenged searches and arrests, there was nothing more than pure speculation linking Tuite to the murder.[17] Because the facts defendants had in their possession regarding Tuite's activities on the night of the murder would not have cast doubt on the existence of probable cause, the Fourth Amendment was not violated by the failure to include this information in the warrant application. *See Garza*, 980 F.2d at 551. Moreover, this information did not negate the existence of probable cause to arrest Joshua Treadway and Aaron Houser.

As an aside, plaintiffs heavily criticize defendants for not more actively pursuing Tuite as a suspect; however, "[t]he police have no affirmative obligation to investigate a crime in a particular way ...." *Gini v. Las Vegas Metropolitan Police Dept.*, 40 F.3d 1041, 1045 (9th Cir.1994). Moreover, the Constitution does not require that police officers thoroughly pursue all possible leads before arresting a suspect. *See Sheik–Abdi*, 37 F.3d at 1247

("Though we have suggested that evidence of interviews and investigations may be a relevant factor in a probable cause analysis, it is not in any way a prerequisite to a finding of probable cause.") (internal citation omitted); *see also Gomez v. Atkins*, 296 F.3d 253, 262 (4th Cir.2002) ("While officers 'may not disregard readily available exculpatory evidence ... the failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause.'") (quoting *Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir.2000)); *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir.1996) (police are not required to investigate alibi of individual before using individual's statement as the basis for probable cause to arrest another; officers are "not required to conduct a minitrial" before making an arrest).

In any event, Tuite was questioned regarding the murder, and his clothes were taken from him. Although plaintiffs contend that defendants ignored blood evidence on Tuite's clothes, one should note that Joshua Treadway's own criminal defense attorney, Mary Ellen Attridge, testified in her deposition that she did not see blood evidence on the shirt when she looked at it. *See* Mary Ellen Attridge DT p. 39: 2–12 (Exhibit 7, NOL of Exhibits in Support of Defendant Summer Stephan's MSJ/Special Motion to Strike/Request for Attorneys Fees and Costs).

Finally, even if defendants were negligent in failing to more vigorously pursue Tuite as a suspect, negligence, even gross

---

**16.** As noted, it is undisputed on this record that Stephanie died between 10:00 and 11:00 p.m. Cheryl Crowe reported to police that she did not fall asleep until 11:00 p.m. *See* Interview with Cheryl Lynn Crowe p. 2 (Exhibit 97, Plaintiff's Supplemental List of Evidence Supporting Opposition to Sweeney's MSJ). Therefore, Cheryl Crowe would have been up at the time of the murder, making it even more reasonable for defendants to believe

that a crazy, agitated individual such as Tuite did not commit the murder.

**17.** The court emphasizes that the relevant inquiry is what information the officers had regarding Tuite's involvement at the time the search warrant was obtained. *See Grant*, 315 F.3d at 1091. Thus, that information regarding Tuite's possible involvement in the murder was later uncovered is irrelevant to the present analysis. *See id.*

negligence, does not support a § 1983 claim. *See Davidson v. Cannon*, 474 U.S. 344, 347–48, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Jones*, 856 F.2d at 992.

#### (c) *The State of the Windows and Doors*

The Treadway plaintiffs contend that defendants omitted material information when they failed to inform the magistrate that some of the windows and doors were unlocked. That certain windows and doors were unlocked is not inconsistent with the boys being involved in the murder and does not necessarily point to Tuite being involved in the murder. Accordingly, had this information been included in the affidavit, it would not have "cast doubt" on the existence of probable cause to believe the murder weapon would be found in the Treadway residence, and therefore this omission was not material.[18] *See Garza*, 980 F.2d at 551.

#### (d) *Joshua Treadway's Alibi*

The Treadway plaintiffs' argument to the contrary notwithstanding, it is immaterial to the probable cause analysis whether Joshua Treadway had an alibi for the time of the murder given that the issue is whether there was probable cause to search the Treadway residence for the murder weapon, which could have been given to Joshua Treadway some time after the murder.[19] Moreover, the Treadway plaintiffs admit that the defendants were not aware at the time of the January 27 search that Joshua had an alibi.[20]

#### (e) *The Existence of the Alleged Conspiracy to "Frame" the Boys*

Finally, the Treadway plaintiffs cannot survive summary judgment by arguing their Fourth Amendment rights were violated because the state court judge was not informed of the alleged "conspiracy to frame Michael and Joshua for Stephanie's murder." Treadway Plaintiffs' Points and Authorities in Opposition to Escondido Defendants' MSJ p. 27:7–8. Assuming the existence of such a conspiracy, because the test for qualified immunity is an objective one, "the officers' subjective intent or beliefs are essentially irrelevant . . . ." *Alford v. Haner*, 333 F.3d 972, 977 (9th Cir.2003); *see also Anderson*, 483 U.S. at 641, 107 S.Ct. 3034 (officer's subjective belief about the search is irrelevant to qualified immunity analysis); *Crawford–El v. Britton*, 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) ("A defense of qualified immuni-

---

**18.** Plaintiffs criticize defendant Sweeney for failing to determine whether each door and window was secured when he inspected the exterior perimeter of the house and for failing to document his inspection in a report. Plaintiffs seize on Sweeney's failure to document his observations in a report because, according to the Houser plaintiffs, "[n]o one else from the Escondido police inspected the house to determine the condition of the doors and windows." p. 8: 3–5. However, this is statement is untrue, as demonstrated by the Houser plaintiffs' own exhibit. Specifically, the record contains a detailed report by Portia Nowak, who worked for the Escondido Police Department as a Community Services Officer, a non-sworn officer position. *See* Exhibit 93, Plaintiffs' Supplemental List of Evidence Supporting Opposition to Sweeney's Motion. Moreover, the existence of this re-

port is consistent with Sweeney's explanation that he did not record the state of the windows and doors because this was a matter for the crime lab. *See* Sweeney DT p. 144:14 (Exhibit 14, [Houser] Plaintiffs' NOL in Support of Plaintiffs' Opposition to Defendant City of Escondido's MSJ).

**19.** It is irrelevant whether Michael could have given the Joshua the knife due to his custodial status. What is relevant is that a reasonable police officer could have believed that someone involved in the murder gave Joshua the knife at a later time.

**20.** *See* email from Robert Francavilla dated December 3, 2003 ("Josh was never asked by police during the January 27/28 interrogation where he was on the night of the murder, and Josh never provided that information.").

ty may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense."). Given the evidence implicating Michael Crowe and the fact that a knife fitting the description of the murder weapon was seen after the murder at the house of Michael Crowe's best friend, Joshua Treadway, the existence of such a conspiracy would, under these facts, not have cast doubt on the existence of probable cause to search the Treadway residence and therefore would have been immaterial to the judge's determination that there was probable cause to issue the warrant.

### (f) Conclusion

In conclusion, given that a knife fitting the description of the murder weapon was seen in the residence of Joshua Treadway, Michael Crowe's best friend, and given that the evidence in defendants' possession suggested that Michael lied about Stephanie's door being closed at 4:30 a.m. and therefore was involved in the murder, there was a fair probability evidence of the murder would be found in the Treadway residence. This conclusion is not altered by consideration of the additional "evidence" identified by the Treadway plaintiffs. As explained, *supra*, there was no reason for defendants to inform the judge that Stephanie's body was fully inside her bedroom at the time of her death because all of the information in defendants' possession suggested otherwise. There was no reason to inform the judge about Tuite's activities on the night of the murder because defendants did not, at the time, have in their possession sufficient information suggesting that he was involved in Stephanie's murder. There was no reason to inform the judge that some of the windows and doors were unlocked because such information was not inconsistent with the boys being involved in the

murder. There was no reason to inform the magistrate judge that Joshua Treadway had an alibi on the night of the murder because it was possible that the knife was given to him at some later time. Finally, even if a conspiracy to "frame" the boys existed, the existence of such a conspiracy would not have influenced the judge's decision to issue the warrant because whether there is probable cause to search depends upon the objective facts, not on an officer's subjective motives.

Accordingly, there was probable cause to support the search of the Treadway residence, and defendants did not violate the Treadway plaintiffs' rights.

Moreover, even if it were determined that there was not probable cause, defendants would be entitled to summary judgment under the second prong of the *Saucier* test, as a reasonable officer could have believed that it was constitutionally permissible to seek a warrant in light of the facts known to these defendants. As the Ninth Circuit explained in *Lombardi*, 117 F.3d at 1126, doubt regarding the materiality of omitted information should be resolved in favor of the police officer. Specifically, the Ninth Circuit explained that, although in *Hervey* the police officer's conduct was "outrageous" and probable cause was clearly lacking without the police officer's false statements,

> in other cases, particularly where omissions are involved, materiality may not have been clear at the time the officer decided what to include in, and what to exclude from, the affidavit. In such cases, *when it is not plain that a neutral magistrate would not have issued the warrant*, the shield of qualified immunity should not be lost, because a reasonably well-trained officer would not have known that the misstatement or omission would have any effect on issuing the warrant.

*Lombardi,* 117 F.3d at 1126 (emphasis added). Here, it is far from plain that the judge would not have issued a warrant for the search of the Treadway home had he been informed of the *actual* information in defendant's possession which was omitted from the affidavit in support of the application for the warrant, detailed *supra,* as opposed to the information alleged by plaintiffs to have been omitted.

Accordingly, the Escondido defendants are entitled to summary judgment with respect to this claim.

### 2. *January 27 Search of the Houser Residence*

▇ On January 27, 1998, Detective Han sought and obtained a warrant to search the Houser residence after Margaret Houser, Aaron Houser's mother, alerted police to the fact that a knife with a 4–5 inch blade which belonged to her son was missing from his collection. The warrant was sought prior to the time that the knives were found under Joshua Treadway's bed. Detective Han executed the warrant. The affidavit in support of the warrant included the following information:

> Defendant Claytor told Detective Han that multiple stab wounds were found on Stephanie's body and those wounds were consistent with a 5–6 inch knife blade. Through interviews, the investigation revealed that Michael Crowe and Aaron Houser are friends. On 1–22–98, detectives Lanigan and Naranjo interviewed Aaron Houser at his residence. Aaron told Detective Naranjo and Lanigan that he and Michael had been friends for over a year and had mutual interest in computer games and in medieval fantasy role play games as well as in weapons, including swords, knives, dirks and dag-

gers. Aaron told the detectives that Michael knew that he had a medieval sword and knife collection but that he had never lent Michael any of his collection. On 1–27–98, Detective J. Lanigan received a telephone call from Margaret Houser, Aaron's mother. Margaret Houser told Detective Lanigan that Aaron had checked his medieval sword and knife collection and that one of the knives was missing. The missing knife was described as being stainless steel in color, with black plastic inserts on the handle and a 4–5 inch blade that came to a point and was sharpened. The knife was further described as having a hand stop and has indentations to facilitate a firmer grip.[21]

Based on these facts, a reasonable officer could have believed that there was probable cause to search the Houser residence, and a state court judge so found. Thus, the issue again is whether defendants deliberately or recklessly disregarded the truth by misrepresenting or omitting information from the affidavit and whether it is plain that without the dishonestly-included information, or with the dishonestly-omitted information, the judge would not have issued the warrant. *See Garza,* 980 F.2d at 551; *Franks,* 438 U.S. at 171–2, 98 S.Ct. 2674; *Hervey,* 65 F.3d at 789. The Houser plaintiffs fail to explain how that standard is met here.

Although the Houser plaintiffs contend that defendants could not rely on Joshua Treadways' confession, there is nothing to suggest that Joshua Treadway's confession was used to establish probable cause to search the Houser residence on January 27. Moreover, as the court has already discussed, at the time this warrant was obtained, the police had information sug-

---

**21.** This is not a verbatim account but rather a paraphrase of what was in the warrant appli- cation.

gesting Michael's involvement in the murder, and the evidence against Tuite was not so strong as to cast doubt on Michael's involvement. Therefore, the information regarding Tuite's activities was not material to the state judge's decision to approve the warrant, and the Houser plaintiffs' Fourth Amendment rights were not violated by the omission of such information.

The Houser plaintiffs assert as a statement of fact that "Sweeney lied and orally reported that the doors and windows of the Crowe house were locked." However, no reasonable factfinder could conclude from reading the portion of the record cited to by the Houser plaintiffs (Sweeney DT pp. 10:3–9; 28:9–20; 38:4–8; 142:17–143:4; 144:7–12 (Exhibit 14, [Houser] Plaintiffs' NOL in Support of Plaintiffs' Opposition to Defendant City of Escondido's Motion for Summary Judgment)) that defendant Sweeney lied and orally reported that the doors and the windows of the Crowe house were locked. Moreover, in any event, even if defendant Sweeney lied about the state of the windows and doors, as stated *supra*, the fact that some of the windows and doors were unlocked was not inconsistent with the boys' involvement in the murder and therefore would not have "cast doubt" on the existence of probable cause.

In conclusion, the search of the Houser residence was supported by probable cause and therefore the Houser plaintiffs' Fourth Amendment rights were not violated. Alternatively, defendants would be entitled to summary judgment under the second prong of the *Saucier* test, as it would not have been clear to a reasonable officers in possession of the same information as defendants that it was constitutionally impermissible to obtain a warrant to search the Houser residence for the murder weapon by including only the facts included by Detective Han.

Accordingly, the Escondido defendants are entitled to summary judgment with respect to this claim.

### 3. February 10 Arrest of Joshua Treadway

Defendant Claytor arrested Joshua Treadway for Stephanie's murder on February 10, 1998. "Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe 'that the suspect has committed, is committing, or is about to commit an offense.'" *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir.1990) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). In determining whether there is probable cause to arrest, it is not enough to consider only certain facts; rather, the existence of probable cause is determined by reference to all of the facts in the police officer's possession. *See Garza*, 980 F.2d at 550 ("Probable cause exists when, '*under the totality of the circumstances known to the arresting officers*, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'") (quoting *United States v. Potter*, 895 F.2d 1231, 1233–34 (9th Cir.1990) (in turn quoting *United States v. Smith*, 790 F.2d 789, 792 (9th Cir.1986))) (emphasis added); *see also United States v. Buckner*, 179 F.3d 834, 837 (9th Cir.1999) (citing *Garza*). Because this was a warrantless arrest and not a search, the court does not look at whether a judge was misled. Rather, the focus is on the facts in defendants' possession and whether, in light of all of these facts, there was probable cause to arrest, or whether a reasonable officer could have believed there was probable cause to arrest.

The declaration of probable cause to arrest, while not definitive on the issue of probable cause, provides a guide for

determining the facts in the possession of the police at the time of the arrest. The declaration of probable cause to arrest Joshua Treadway sets forth the fact that Stephanie Crowe was stabbed to death in her home, that Michael Crowe had made statements implicating himself in the crime, that Joshua Treadway was Michael's best friend, that during an interview with Joshua Treadway in his home police observed a knife, that the Treadway house was searched pursuant to a warrant and a knife was found which resembled the knife reported by Aaron Houser as missing from his collection, and that Joshua Treadway subsequently admitted that the knife was the murder weapon, that he was present during plans to kill Stephanie, that he was present at the time of the homicide, and that the plan was for him to dispose of the knife, which he attempted to do.

Based on these facts, a prudent person would be warranted in believing that Treadway was co-conspirator in Stephanie's murder. *See Barry*, 902 F.2d at 773 ("Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe 'that the suspect has committed, is committing, or is about to commit an offense.'") (quoting *DeFillippo*, 443 U.S. at 37, 99 S.Ct. 2627). However, the issue is whether a reasonable officer armed with *all* of the knowledge that defendants had at the time of the arrest could have believed that Joshua Treadway was involved in the murder of Stephanie Crowe. *See Garza*, 980 F.2d at 550; *Buckner*, 179 F.3d at 837 (citing *Garza*).

For the reasons set forth *supra*, the circumstances known to defendants regarding the state of the doors and windows and Tuite's activities on the night of the murder were not material to the probable cause determination, nor was the alleged existence of a conspiracy to "frame" the boys. Moreover, regardless of whether Michael Crowe actually made incriminating statements, given defendants' knowledge as to the location of Stephanie's body and her time of death and Michael's story that Stephanie's door was closed at 4:30 a.m., a reasonable officer would have believed there was a fair probability that Michael Crowe was involved in Stephanie's murder.

In addition, although the statements made during the latter portion of Joshua Treadway's February 10 interrogation were coerced, the court has concluded after viewing the videotape of this interrogation, and in light of the time that passed since Joshua's January 27–28 interrogation, that Joshua's statements up until page 174 of the transcript of the February 10 interrogation were voluntary and not coerced. Joshua's voluntary statements on February 10 included a statement that Aaron had given him a knife and had told him that the knife was used to kill Stephanie and that Joshua had agreed to hide the knife. Because these statements were voluntary and not coerced, these statements could be used to establish probable cause.

Moreover, even if it were determined that these specific statements were coerced, given that at least one judge has found that none of Treadway's February 10 statements were coerced,[22] a reasonable

22. Judge Thompson ruled that the un-*Mirandized* portion of Joshua Treadway's February 10 statements was inadmissible at trial in the government's case-in-chief because he was not advised of his *Miranda* rights prior to making the statements. However, Judge Thompson ruled that Joshua Treadway's subsequent *Mirandized* statements on February 10 were admissible because both the un-*Mirandized* and *Mirandized* February 10 statements were voluntary. Specifically, Judge Thompson concluded that "from the very beginning and throughout every viewing of [the February 10] tape, there is no doubt in my mind that Joshua Treadway was making vol-

police officer certainly could have concluded that these particular statements were not coerced, and therefore a reasonable officer could have factored these statements into a probable cause analysis.

Finally, in light of all of the evidence, the fact that Joshua Treadway's parents could provide him an alibi for the night of the murder does not negate the existence of probable cause to arrest him, as the police are not constitutionally obligated to investigate whether a defendant has an alibi prior to an arrest. *See Brodnicki*, 75 F.3d at 1264. Moreover, it was reasonable to conclude that the murder weapon could have been given to him at some later time, as Joshua initially told police.

In conclusion, in light of all of the information possessed by defendants, a reasonable officer would have believed there was a fair probability that Joshua Treadway was involved in Stephanie's murder. Because there was probable cause for the arrest, defendants did not violate Joshua Treadway's rights by arresting him on February 10. Moreover, even if it were determined that there was not probable cause for Joshua Treadway's arrest, defendants would be entitled to qualified immunity under the second prong of the *Saucier* test because it would not have been clear to a reasonable officer in possession of the same facts as defendants that it was unlawful to arrest Joshua Treadway.

Accordingly, the Escondido defendants are entitled to summary judgment with respect to this claim.

### 4. February 11 Search of the Houser Residence and Aaron Houser's School Locker

■ Defendant Claytor obtained the warrant for the February 11 search of the Houser residence. The warrant was obtained telephonically. The warrant sought knives, knife cleaning equipment and metal cleaning solvents, clothing or objects bearing blood or stains from other bodily fluids, including gloves. The following facts were provided to the judge in support of the warrant application:

Stephanie was stabbed to death in her home. Michael Crowe was arrested after a determination that he was involved in the homicide. Treadway and Houser were his two best friends. During an interview with Joshua Treadway in his home, a knife was seen by the investigating officers. As a result, a warrant was obtained for a search of the Treadway home. That search revealed a knife that was identified by Aaron Houser as a knife that was missing from his knife collection. A search warrant was obtained for the Houser residence, and a search of the Houser residence revealed numerous knives.

Subsequent interviews were done with Joshua Treadway in regard to the knife. Joshua Treadway indicated that on January 25, 1998 he received the knife from Aaron Houser and was told at that time that the knife was used to kill Stephanie Crowe. Joshua Treadway was given instructions to get rid of the knife. In subsequent interviews Joshua Treadway stated that the death of Stephanie Crowe was actually a planned event that had been discussed two to three weeks prior to the homicide during classes and lunch at Orange Glen high School in the City of Escondido. On the night that the homicide occurred he was in touch with both Aaron Houser and Michael Crowe and was given instructions to go to Aaron's house and then to Michael Crowe's house at about midnight on the

untary statements on February 10. They were not coerced." *See* RT of December 17, 1998 Motion Hearing in *People v. Crowe, et al.*

p. 5:23–26 (Exhibit P, Escondido Defendants' Summary Judgment Motion against Houser Plaintiffs).

night of the homicide. At that location, Joshua Treadway was given instructions to wait outside and watch for anybody coming by. While he did so, he saw Aaron Houser enter the house, after being let in by Michael Stephen Crowe. As Aaron Houser was entering the house, he was seen taking the knife in question out of his waistband area and entering the house with it in his open hand. Joshua Treadway stated that he did not remain outside but went into the house into a kitchen area. Several minutes later he saw Aaron Houser come into the kitchen with the knife. He saw Aaron Houser rinse the knife off in the kitchen sink. As he leaves with Aaron Houser, Aaron Houser tells Joshua Treadway that Joshua is to get rid of the knife; however, Aaron is going to keep the knife to clean it up, to make sure that the job is done properly. On January 25 Aaron gave Joshua Treadway the knife, with instructions to get rid of it and clean it. Joshua Treadway stated that during the commission of this homicide, Aaron Houser was seen wearing a dark jacket and dark pants and/or shorts and black gloves, which he describes as gloves that Aaron wore to band practice at school. As a result of the interviews, Joshua Treadway was taken into custody and subsequently taken to San Diego County Juvenile Hall.[23]

Clearly, the above facts established probable cause to search. Thus, the issue once again becomes whether the affidavit in support of the search warrant materially misrepresented the facts known to defendants.

Although the reliability of some of the information Claytor included in the warrant is suspect due to the fact that it was

obtained as the result of the coercion of Joshua Treadway, as noted, *supra*, during the first part of his February 10 interview, Joshua Treadway told the police that Aaron gave him a knife and told him that the knife was used to kill Stephanie, and this court has determined that these statements were not coerced. Considering only these uncoerced statements, a reasonable officer could have believed that Aaron was involved in Stephanie's murder and that a search of his residence and locker would yield evidence of the crime. *See Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir.1998) ("[P]robable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth, that matters."). Moreover, even if it were determined that these statements were coerced, given that at least one judge has found that none of Treadway's February 10 statements were coerced,[24] a reasonable police officer certainly could have concluded that Treadway's February 10 statements were not coerced and therefore could have factored these statements into a probable cause analysis.

Furthermore, as discussed *supra*, the evidence that the police had with respect to Tuite and the state of the windows and doors was not material to the state judge's probable cause analysis and therefore did not need to be included in the search warrant. Furthermore, as discussed *supra*, a reasonable officer could have believed that Michael Crowe was involved in Stephanie's death. Thus, it was not materially misleading to inform the judge that Michael Crowe had been arrested for Stephanie's murder.

In addition, the Houser plaintiffs' argument to the contrary notwithstanding, no

---

**23.** This is not a verbatim account but rather a paraphrase of what was in the warrant application.

**24.** *See* footnote 22, *supra*.

reasonable factfinder could find that defendants misrepresented that Michael and Aaron were friends. Clearly, the fact of the boys' friendship was material to the issuance of the warrant. However, no reasonable factfinder could find that defendant Claytor deliberately lied or recklessly disregarded the truth when he represented that Michael and Aaron were friends, as it is undisputed that when Ms. Houser called the Escondido Police Department to report Aaron's missing knife, she informed defendants that Aaron was a friend of Michael Crowe.[25] *See Hervey,* 65 F.3d at 789 (a defendant police officer is entitled to summary judgment on qualified immunity grounds where the omission of information was not the result of a deliberate falsehood or a reckless disregard of the truth).

Finally, the Houser plaintiffs have admitted that the police officers did not know that Aaron Houser had an alibi,[26] and the police are not constitutionally obligated to investigate whether a defendant has an alibi prior to an arrest. *See Brodnicki,* 75 F.3d at 1264. Thus, it was not unreasonable for defendants to fail to inform the judge that Aaron Houser allegedly had an alibi.

In conclusion, in light of all of the evidence known to defendants, including the evidence relied upon by the Houser plaintiffs, a reasonable officer person would have believed there was a fair probability that evidence related to Stephanie Crowe's murder would be found in the Houser residence and in Aaron Houser's locker. Therefore, there was probable cause for the searches. However, even if there were no probable cause for the searches, defendants would be entitled to qualified immunity under the second prong of the *Saucier* test, because it would not have been clear to a reasonable officer possessing the same facts as defendants that it was unlawful to obtain these warrants, where there is no evidence that defendants materially misrepresented the facts to the judge who issued the warrant.

Accordingly, the Escondido defendants are entitled to summary judgment with respect to this claim.

### 5. February 11 Arrest of Aaron Houser

 At the time of Aaron Houser's arrest, defendants had before them Joshua Treadway's uncoerced statement that Aaron had given him the knife and had told him that the knife was the knife used to kill Stephanie and that Aaron had participated in the killing with Michael. The police also had reason to believe that Michael Crowe lied about Stephanie's door being closed at 4:30 a.m. and therefore had reason to believe that Michael Crowe, a friend of Aaron's, was involved in the mur-

---

**25.** According to the Separate Statement of Uncontroverted Facts in Support of Escondido's MSJ or in the Alternative, Partial Summary Judgment of the Claims Asserted by the Houser Plaintiffs:

"On January 27, 1998, Aaron Houser's mother, plaintiff Margaret Houser, called the Escondido Police Department and reported that her son Aaron, *who was a friend of Michael Crowe,* was missing a knife."

*See* Statement of Fact # 5 (emphasis added). In support of this statement of fact, defendants note that Detective James Lanigan testified in his deposition that Ms. Houser indicated that she thought the missing knife might be of interest to police "in light of her son being friends with Michael Crowe." *See* Exhibit C p. 57:18–21, attached to Memorandum of Points and Authorities in Support of Escondido Defendants' MSJ or in the Alternative, Partial Summary Judgment, of the Claims Asserted by the Houser Plaintiffs. *Plaintiffs do not dispute that Ms. Houser indicated to police that Michael and Aaron were friends. See* Plaintiffs' Opposition to Defendant City of Escondido's Separate Statement in Support of MSJ p. 2, # 5.

**26.** *See* email from Louis Arnell dated November 25, 2003.

der. Furthermore, police knew that Stephanie was stabbed with a knife that fit the description of Aaron Houser's knife, which was found under Joshua Treadway's bed. Based on this information, a prudent person would be warranted in believing that Aaron Houser was involved in Stephanie's murder. Moreover, for the reasons set forth *supra,* the information defendants had in their possession regarding Tuite, the state of the windows and doors, and the alleged conspiracy would not have cast sufficient doubt on Aaron's involvement in the murder so as to negate the existence of probable cause.

Because there was probable cause to arrest Aaron, defendants did not violate the Fourth Amendment by arresting him. Alternatively, defendants would be entitled to qualified immunity under the second prong of the *Saucier* test because it would not have been clear to a reasonable officer that it was unlawful to arrest Aaron in light of the evidence in defendants' possession.

Accordingly, the Escondido defendants are entitled to summary judgment with respect to this claim.

### 6. The "Strip Searches" of the Boys

Defendants move for summary judgment with respect to Joshua Treadway's and Aaron Houser's claims that they were "strip searched" in violation of the Fourth Amendment after their arrests. Although the court has been provided few facts with respect to this claim, the court notes that Joshua Treadway refers in his opposition to being "semi-nude," which suggests that he was allowed to keep his underwear on. *See* The Treadway Plaintiffs' Points and Authorities in Opposition to the Escondido Defendants' MSJ or in the Alternative, Partial Summary Judgment p. 30:20–21.

To pass constitutional muster, strip searches must be supported by reasonable suspicion. *See Kirkpatrick v. City of Los Angeles,* 803 F.2d 485, 488 (9th Cir.1986). "A reasonable suspicion exists when the person responsible for the search is aware of specific articulable facts, and inferences from those facts, which reasonably warrant a suspicion that evidence will be uncovered." *Id.* at 490.

Given the brutality of the murder and the manner in which it was carried out, it certainly would have been reasonable for the police to believe that whoever committed the murder would have cuts, scratches, bruises, or other signs of a physical altercation which would be important evidence at a murder trial. In light of Joshua Treadway's statements regarding Aaron Houser's alleged role in the murder and the chilling and graphic statements made by Aaron Houser regarding how he would hypothetically murder Stephanie with a knife, which statements suggested that Aaron Houser had the inner fortitude to commit such a murder, defendants were justified in forming a suspicion that Aaron Houser was involved in the murder and therefore could have scratches, bruises, cuts, or other signs of a physical altercation. Accordingly, defendants were justified in performing a visual search of Aaron Houser in order to determine whether he showed physical signs of an altercation which would corroborate Joshua's statements and which would need to be preserved for trial by means of photographs.

The court finds that there was reasonable suspicion to conduct a partial strip search of Joshua Treadway as well.[27] Although Joshua Treadway did not confess to actually stabbing Stephanie, such a con-

---

27. The court notes that Joshua Treadway merely mentions this claim (in one sentence) in passing.

fession is not necessary to justify requiring Joshua Treadway to strip down to his underwear for a visual examination, where Joshua Treadway told police that he was present in the Crowe house at the time of the murder, a knife fitting the description of the murder weapon was found under his bed, and the murder was of the type that one could reasonably believe would leave the murderer with cuts, bruises, scratches, or other signs of a physical altercation.

Finally, the court notes that plaintiffs contend that these searches were unreasonable because they occurred almost three weeks after the murder. However, plaintiffs have failed to present any evidence suggesting that physical evidence such as defendants were looking for would not still be visible three weeks later.

Accordingly, the court concludes that defendants did not violate Joshua Treadway's and Aaron Houser's Fourth Amendment rights by conducting these searches. However, even if it were determined that there was a Fourth Amendment violation because of the amount of time that passed between the murder and the searches, defendants would be entitled to qualified immunity under the second prong of the *Saucier* test because it would not have been clear to a reasonable officer that a visual search of a suspect who has been arrested in a stabbing death is unlawful three weeks after the murder.

Accordingly, the Escondido defendants are entitled to summary judgment with respect to Joshua Treadway's and Aaron Houser's Fourth Amendment claims to the extent those claims are predicated upon the fact that they were strip searched.

## II. Second Claim for Relief—Violation of the Fifth Amendment

In their second claim for relief, the boys allege that defendants Blum, Wrisley, Sweeney, Claytor, McDonough, and Anderson violated their Fifth Amendment privilege against compelled self-incrimination. Defendants Blum, McDonough and Sweeney have filed motions for summary judgment addressing all three boys' Fifth Amendment claims. For unknown reasons, defendants Wrisley, Claytor and Anderson challenge only Joshua Treadway's and Aaron Houser's Fifth Amendment claims.

### A. Fifth Amendment Privilege Against Self–Incrimination

As a preliminary matter, as noted *supra,* "[a] defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions." *Gilbrook,* 177 F.3d at 856–57. On this record, given the manner in which the boys were interrogated and the length of the interrogation, a reasonable jury could find that defendants conspired to coerce confessions from the boys. Nonetheless, defendants may not be held liable simply because they conspired to violate the boys' Fifth Amendment rights. Rather, in order for the boys to have a viable claim against defendants, the boys must demonstrate that their Fifth Amendment rights were actually violated. *See Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1st Cir.1980) ("[W]hile conspiracies may be actionable under section 1983, it is necessary that there have been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws."); *see also Dooley v. Reiss,* 736 F.2d 1392, 1395 (9th Cir.1984).

At the time of the boys' interrogations, Ninth Circuit case law held that a Fifth Amendment violation occurs at the moment police officers coerce a confession from a suspect. However, as will be seen, after the filing of this action, there was a sea change regarding when the Fifth Amendment is actually violated, and in

light of this sea change, the boys cannot demonstrate a Fifth Amendment violation.

The Fifth Amendment, which applies to the States via the Fourteenth Amendment, *Malloy v. Hogan,* 378 U.S. 1, 5, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), provides that no person "shall be compelled *in any criminal case* to be a witness against himself. . . ." U.S. CONST. amend. V (emphasis added). The Supreme Court has characterized the Fifth Amendment privilege against compelled self-incrimination as a privilege that "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States,* 406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The Fifth Amendment's "sole concern is to afford protection against being 'forced to give testimony leading to the infliction of penalties affixed to . . . criminal acts.'" *Kastigar,* 406 U.S. at 444, 92 S.Ct. 1653 (quoting *Ullmann,* 350 U.S. at 438–9, 76 S.Ct. 497 (in turn quoting *Boyd v. United States,* 116 U.S. 616, 634, 6 S.Ct. 524, 29 L.Ed. 746 (1886))).

To this end, the Fifth Amendment operates in several distinct ways. First, absent immunity, an individual may assert the privilege against self-incrimination at any proceeding, be it civil or criminal, "wherever the answer might tend to subject to criminal responsibility him who gives it." *McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 69 L.Ed. 158 (1924). Moreover, an individual may not be held in contempt for refusing to answer on Fifth Amendment grounds, where there is a basis for asserting the privilege, unless the individual is afforded immunity that is co-extensive with the protection afforded by the Fifth Amendment. *See Kastigar,* 406 U.S. at 462, 92 S.Ct. 1653. Finally, the Fifth Amendment operates to preclude the government's use of compelled testimony at trial in its case in chief. *See Oregon v.*

*Elstad,* 470 U.S. 298, 306–7, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

While the manner in which the Fifth Amendment operates to protect an individual from self-incrimination is clear, what is not clear is when the Fifth Amendment is actually violated for purposes of allowing the imposition of liability for damages pursuant to 42 U.S.C. § 1983. Until recently, the law in the Ninth Circuit was that the Fifth Amendment is violated at the moment police coerce or compel a statement from a suspect, and therefore the Ninth Circuit recognized a § 1983 claim based on mere coercion. *See Cooper v. Dupnik,* 963 F.2d 1220, 1243 (9th Cir.1992) (en banc), *overruled by Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003). However, a majority of the Justices in *Chavez* rejected *Cooper*'s holding and concluded that the act of coercing a statement from a suspect, in and of itself, is not an act in violation of the Fifth Amendment self-incrimination clause upon which a § 1983 claim may be predicated. Justice Thomas, joined by the Chief Justice and two other Justices, concluded that in order for the Fifth Amendment to be implicated, the suspect must be compelled, *in a criminal case,* to be a witness against himself. These four Justices concluded that there is no criminal case for Fifth Amendment purposes until, at the earliest, "legal proceedings" have been initiated. Justice Thomas explained:

> We need not decide today the precise moment when a "criminal case" commences; it is enough to say that police questioning does not constitute a "case" any more than a private investigator's precomplaint activities constitute a "civil case."

538 U.S. at ——, 123 S.Ct. at 2001.

Justice Souter, joined by Justice Breyer, provided a slightly different reasoning in support of his conclusion that Martinez

was not entitled to damages. Justice Souter approached the issue before the Court from a policy perspective, concluding that Martinez' claim should fail on the ground that Martinez could not "make the 'powerful showing,' subject to a realistic assessment of costs and risks, necessary to expand protection of the privilege against compelled self-incrimination to the point of the civil liability he asks us to recognize here." *Id.* at ——, 123 S.Ct. at 2007. As Justice Souter explained:

> If obtaining Martinez' statement is to be treated as a stand-alone violation of the privilege subject to compensation, why should the same not be true whenever the police obtain any involuntary self-incriminating statement, or whenever the government so much as threatens a penalty in derogation of the right to immunity, or whenever the police fail to honor *Miranda?* Martinez offers no limiting principal or reason to foresee a stopping place short of liability in all such cases.

*Id.* at ——, 123 S.Ct. at 2007.

 After *Chavez,* it is clear that a § 1983 plaintiff cannot succeed on a Fifth Amendment self-incrimination claim predicated solely upon coercive police interrogation resulting in an involuntary confession. Thus, to the extent that the boys' Fifth Amendment claim is predicated solely upon the fact that defendants interrogated them in a manner that produced involuntary confessions, their claims must fail. However, the court must explore *terra incognita* because, unlike in *Chavez,* the boys' statements here were "used" against

them at a grand jury proceeding and also at a proceeding (referred to as a "707 hearing")[28] which was held in order to determine whether the boys should be tried in adult rather than juvenile court. Thus, assuming for the moment that certain of the boys' statements were the product of police coercion[29] and that liability for damages under § 1983 can, at least in some circumstances, be predicated upon a violation of the Fifth Amendment privilege against self-incrimination, this court is squarely confronted with the question of whether a "criminal case," as that term is used in the Fifth Amendment, means "criminal trial," or whether it encompasses grand jury proceedings and all proceedings that occur after an indictment is handed down.

 The court begins by noting that, prior to *Chavez,* the Supreme Court had on more than one occasion characterized the privilege against self-incrimination as a *trial* right. *See Withrow v. Williams,* 507 U.S. 680, 692, 113 S.Ct. 1745, 123 L.Ed.2d 407 (9th Cir.1993) ("Nor does the Fifth Amendment 'trial right' protected by *Miranda* serve some value necessarily divorced from the correct ascertainment of guilt."). As the Supreme Court explained in *United States v. Verdugo–Urquidez,* 494 U.S. 259, 264, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990):

> The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental *trial right* of criminal defendants. *Although conduct by law enforcement officials prior to trial may*

---

**28.** *See* Cal. Welf. & Inst.Code 707. The court notes that the police officer defendants argue that it was actually the boys who introduced their statements at the 707 hearing. The court finds that the current record is ambiguous on this point, and therefore for purposes of this motion the court assumes that the prosecutor, not the boys, introduced the boys' statements at the 707 hearing. Moreover, the

prosecutor clearly was the one who introduced the boys' statements at the grand jury proceeding.

**29.** For purposes of this particular analysis of the boys' Fifth Amendment claim at the summary judgment stage, the court assumes that the boys made involuntary statements as the result of psychological coercion.

*ultimately impair that right, a constitutional violation occurs only at trial.*

(emphasis added) (internal citation omitted). Although these statements are dicta, they are cited with favor by the plurality in *Chavez.* Moreover, Supreme Court dicta is not easily ignored. *See Laub v. U.S. Dept. of Interior,* 342 F.3d 1080, 1090 (9th Cir.2003) ("Supreme Court dicta is not to be lightly disregarded."); *United States v. Baird,* 85 F.3d 450, 453 (9th Cir.1996) ("[W]e treat Supreme Court dicta with due deference...."); *Zal v. Steppe,* 968 F.2d 924, 935 (9th Cir.1992) ("[D]icta of the Supreme Court have a weight that is greater than ordinary judicial dicta as prophesy of what that Court might hold. We should not blandly shrug them off because they were not a holding.").

Furthermore, a plurality of four justices in *Chavez* suggest, through their own choice of language, that the Fifth Amendment is a trial right. *See Chavez,* 538 U.S. at ——, 123 S.Ct. at 2004 (Thomas, J.) ("Our views on the proper scope of the Fifth Amendment's Self–Incrimination Clause do not mean that police torture or other abuse that results in a confession is constitutionally permissible so long as the statements are not used *at trial;* it simply means that the Fourteenth Amendment's Due Process Clause, rather than the Fifth Amendment's Self–Incrimination Clause, would govern the inquiry in those cases and provide relief in appropriate circumstances.") (emphasis added).

The conclusion that "criminal case" means "criminal trial" is also supported by the Supreme Court's reasoning in *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). In *Lawn,* the defendants moved to dismiss the indictment on the ground that it was obtained using their own coerced testimony. The defendants had previously been compelled to appear before a grand jury to testify and produce records while criminal informations charging tax evasions were pending against them without being warned of their Fifth Amendment rights. The defendants were indicted, but the indictments were dismissed. The defendants were then indicted a second time on similar charges. The defendants moved to dismiss the second indictment, contending that the evidence they were previously compelled to present was used to obtain the second indictment. The defendants also sought a hearing so that they could seek evidence in support of their contention.

The Supreme Court affirmed the denial of such a hearing. It noted that it had "several times ruled that [an] indictment returned by a legally constituted nonbiased grand jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits and satisfies the requirements of the Fifth Amendment" and concluded that the defendants were not entitled to an evidentiary hearing to develop the factual basis for their assertions. *Id.* at 349–50, 78 S.Ct. 311. Importantly, the Court explained that "[i]t should be unnecessary to say that we are not here dealing with the use of incompetent or illegal evidence *in a trial on the merits,* nor with the right to decline to give incriminating testimony in legal proceedings or to suppress the direct or derivative use *at the trial* of evidence illegally obtained." *Id.* at 350, 78 S.Ct. 311 (emphasis added). Thus, the Court clearly distinguished between use of a coerced statement at trial and use of a coerced statement at a grand jury proceeding. The distinction drawn by the Court in *Lawn* further confirms that the Fifth Amendment was directed at preventing convictions, rather than indictments, resulting from coerced statements.

In support of their argument that a criminal case commences with a grand jury proceeding, the boys contend that

"criminal case" cannot mean "criminal trial" because at the time the Fifth Amendment was passed, defendants could not testify on their own behalf at trial, and therefore the framers could not have been trying to protect an accused from being called as a witness in his criminal trial. This argument is unavailing. At the time the Fifth Amendment was passed, a defendant could be an indirect witness against himself because, as the boys note, it was permissible at trial for another person to testify as to pretrial statements made by the defendant pursuant to questioning.

Finally, there are strong policy reasons for finding that the use of a compelled statement violates the Fifth Amendment privilege against self-incrimination only when the statement is used at trial. If federal courts were to recognize a Fifth Amendment violation based upon the use of coerced statements in grand jury proceedings, the result would be that defendants could insist on a "preliminary trial" to determine the validity of the indictment. The Supreme Court has consistently rejected efforts to afford defendants such a right. As the Supreme Court noted in *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956):

> If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment.

*Id.* at 363, 76 S.Ct. 406; *see also Lawn*, 355 U.S. at 350, 78 S.Ct. 311. The Court went on in *Costello* to explain that allowing defendants to challenge indictments based on the evidence presented to the grand jury

> would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial.

*Costello*, 350 U.S. at 364, 76 S.Ct. 406.

Perhaps recognizing the strong policy reasons dictating against a finding that the Fifth Amendment is violated upon the use of a compelled statement in a grand jury proceeding, plaintiffs alternatively argue that a 707 hearing, which necessarily follows rather than proceeds a grand jury proceeding, is a "trial" under California law. For the proposition that courts should look to state law in order to determine whether a proceeding is a trial for Fifth Amendment purposes, the Treadway plaintiffs cite *Hamilton v. Alabama*, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961). In that case, the court looked to state law to determine whether an arraignment was "a critical stage in a criminal proceeding" so that the defendant was entitled to counsel at his arraignment. *Hamilton* is inapplicable here. As noted *supra*, the Fifth Amendment's "sole concern is to afford protection against being forced to give testimony *leading to the infliction of penalties* affixed to ... criminal acts.'" *Kastigar*, 406 U.S. at 444, 92 S.Ct. 1653 (emphasis added) (internal citations omitted). A 707 hearing is a hearing to determine in which court—juvenile or adult—a defendant should be tried. Regardless of how California law might characterize a 707 hearing, it cannot be said

that the use of a defendant's testimony at a 707 hearing leads to the infliction of penalties affixed to criminal acts. At most, the use of a defendant's testimony at a 707 hearing leads to a determination of the forum in which it will be determined whether penalties will be affixed to the defendant's criminal acts.

For the reasons set forth above, the court concludes that for Fifth Amendment purposes, "criminal case" means "criminal trial," *i.e.*, a proceeding at which a defendant's guilt is determined. Therefore, the Fifth Amendment privilege against self-incrimination is not violated by the use of a defendant's compelled statements unless and until the statements are used against the defendant at trial. Here, the boys' statements were not used against them at trial. Accordingly, the boys have failed to make out a cognizable § 1983 claim for violation of their Fifth Amendment privilege against compelled self-incrimination, and defendants are entitled to summary judgment with respect to this claim.

■■ Defendants are entitled to summary judgment with respect to this claim for an additional reason. Legal causation, or proximate cause, is an element of a § 1983 claim that must be proved. *See Baker v. McCollan*, 443 U.S. 137, 142, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) ("[A] public official is liable under § 1983 only 'if he *causes* the plaintiff to be subjected to deprivation of his constitutional rights.'") (quoting *McCollan v. Tate*, 575 F.2d 509, 512 (5th Cir.1978)) (emphasis in original); *Arnold*, 637 F.2d at 1355 (although "not often discussed or explicitly stated in civil rights cases," causation is an element of a § 1983 claim that must be proved); Ninth Circuit Manual of Model Jury Instructions (Civil) 11.1 (to prove the violation of a federal civil right, the plaintiff must prove by a preponderance of the evidence that "the acts or omissions of the defendant were the cause of the deprivation of the

plaintiff's rights protected by the Constitution or laws of the United States."). As the Ninth Circuit has explained in *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978):

A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made. Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causation can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

(internal citations omitted).

Even if it could be said that the Fifth Amendment privilege against self-incrimination is violated by use of a coerced statement in a grand jury proceeding or a 707 hearing, it cannot be said that a police officer is the proximate cause of such a violation. If a statement is used at a grand jury proceeding or a 707 hearing, it is the prosecutor, not the police officer, who decides to introduce and actually introduces the statement into evidence. Moreover, at a 707 hearing, it is the trial judge who ultimately determines whether the statement will be admitted. Thus, as a matter of law, a police officer himself does not "subject" a defendant to a deprivation of the right against self-incrimination when a coerced statement is admitted at such proceedings.

Moreover, it cannot be said that a police officer "causes" a defendant to be subjected to a violation of the privilege against

self-incrimination when a coerced statement is admitted at such proceedings. As explained in *Johnson*, 588 F.2d at 743, one causes another to be subjected to a constitutional deprivation "by setting in motion a series of acts by others *which the actor knows or reasonably should know* would cause others to inflict the constitutional injury." (emphasis added). Given the roles and obligations of prosecutors and judges and the independent nature of these positions, a police officer could not reasonably know that by obtaining a coerced confession he will cause a prosecutor and/or a trial judge to violate a defendant's Fifth Amendment privilege against self-incrimination.[30] Thus, as a matter of law the police officer defendants are not the proximate cause of the Fifth Amendment violation alleged by the boys.

Practical considerations further support the court's conclusion that a police officer is not the proximate cause of, and therefore cannot be held civilly liable for, violation of the Fifth Amendment privilege against self-incrimination based on the use of a coerced statement in a criminal case. As noted, a majority of Justices in *Chavez* concluded that a police officer may not be held liable merely for engaging in coercive questioning. Simply put, if a police officer cannot be held liable for his own act of coercing a confession, there is no principled basis for allowing the officer to be held liable for the prosecutor's act of introducing the coerced confession in a criminal case, or for the trial court's act of erroneously allowing the coerced confession to be introduced in a criminal case.

Moreover, as defendants note, allowing the imposition of officer liability for use of a coerced statement by a prosecutor in a criminal case would have the perverse effect of assuring that only the most culpable officers escape civil liability for their actions, for only if a police officer coerces a confession using methods of interrogation that are clearly impermissible under the law will the officer be assured that the trial judge will exclude the confession at trial, thereby assuring that the suspect's statement will not be "used" in a "criminal case" within the meaning of the Fifth Amendment.

Of course, this does not mean that there is no recourse when a police officer coerces a confession. A suspect's Fifth Amendment rights are protected by the rule that a coerced confession may not be introduced in a criminal case. Moreover, as noted by the plurality in *Chavez* and as will be discussed *infra*, if the manner in which a confession is compelled is particularly egregious, the substantive due process clause of the Fourteenth Amendment offers a remedy.

As for defendant Blum, as noted in section I.A. *supra*, defendant Blum, as a private actor, is not the proximate cause of a constitutional violation committed by a state actor unless he "had some control over" the state actors' decision to commit the unconstitutional act. *See Franklin*, 312 F.3d at 446. There is no evidence in the record suggesting that defendant Blum had such control over the police officer defendants.

Finally, Aaron Houser's Fifth Amendment claim fails for an additional reason. Having reviewed the videotape of the interrogation as well as the transcript of that interrogation, the court concludes that as a

---

**30.** The court need not decide whether a police officer could be a proximate cause of a Fifth Amendment violation where the police officer and the prosecutor conspired to violate the defendant's Fifth Amendment rights, because no reasonable factfinder could find that Summer Stephan or Gary Hoover, the prosecutors in this case, conspired to violate the boys' Fifth Amendment right against compelled self-incrimination through the use of the boys' statements in a "criminal case."

matter of law, any statements made by Aaron Houser on January 27 or February 11 were not the product of coercion. Moreover, even if Aaron Houser's statements could be deemed the product of coercion, qualified immunity would be available. In addition to this court's finding that Aaron Houser's interrogation was not conducted in a coercive manner and that statements Aaron Houser made to defendants were not the product of his will being overborne, Judge Thompson concluded that Aaron Houser's statements were not coerced. *See* RT of December 17, 1998 Motion Hearing in *People v. Crowe, et al.* p. 2:5–17 (Exhibit P, attached to Memorandum of Points and Authorities in Support of Escondido Defendants' MSJ or in the Alternative, Partial Summary Judgment, of the Claims Asserted by the Houser Plaintiffs). If both a state court judge and a federal court judge are able to conclude that Aaron Houser's statements were not the product of coercion, a reasonable officer certainly could have believed that Aaron's interrogation was not coercive. For this additional reason, defendants are entitled to summary judgment with respect to Aaron Houser's Fifth Amendment claim.

### B. *Miranda*

■ To the extent that the boys' § 1983 claims are predicated upon defendants' questioning of them without first providing *Miranda* warnings, such a claim is not cognizable after *Chavez. See Chavez*, 538 U.S. at ——, 123 S.Ct. at 2004 (Justice Thomas, joined by the Chief Justice and Justices O'Connor and Scalia)

("Chavez's failure to read *Miranda* warnings to Martinez did not violate Martinez's constitutional rights and cannot be grounds for a § 1983 action"); *Id.* at ——, 123 S.Ct. at 2013 (Justice Kennedy, joined by Justice Stevens) ("[F]ailure to give a *Miranda* warning does not, without more, establish a completed violation when the unwarned interrogation ensures."). Accordingly, defendants are entitled to summary judgment with respect to this claim.

### III. Fourth Claim for Relief—Fourteenth Amendment Substantive Due Process Clause ("Shocks the Conscience")

All of the plaintiffs bring claims against defendants Blum, Wrisley, Sweeney, Claytor, McDonough and Anderson for violation of their Fourteenth Amendment substantive due process right to be free of government conduct that "shocks the conscience." Defendants Blum, McDonough and Sweeney seek summary judgment with respect to all of the plaintiffs' claims. Defendants Claytor, Wrisley and Anderson seek summary judgment only with respect to the claims brought by the Treadways and Housers.[31]

### A. The Treadway and Houser Plaintiffs' Claims

Although a review of the complaint leaves one wondering about the factual basis underlying the Treadways' and Housers' claims, it appears from their oppositions to the motions for summary judgment that these claims are largely predicated upon the interrogations and "strip searches" of the boys.[32] In addition,

---

**31.** Defendant Stephan was originally named in this count; however, she was dismissed from this count by the Court in its July 26, 2000 order.

**32.** *See* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Chris McDonough's Motion for Summary Adjudication/ Judgment as to all Claims by Michael

Crowe, Aaron Houser and Joshua Treadway p. 25:4–7 ("In this case, given the outrageous and shocking conduct perpetrated by McDonough in his interrogations of the boys, they may proceed under both the Fifth and Fourteenth Amendments."); Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant McDonough's MSJ of the Claims

Aaron Houser predicates his claim on the allegations that the Escondido police department lied to the Housers about the purpose of the investigation in order to interrogate Aaron under false pretenses and deceived Aaron by forcing Joshua Treadway to make a ruse telephone call with the intent of eliciting incriminating statements from him. Aaron also predicates his claim against defendant Blum on the allegation that defendant Blum compared him to Charles Manson and stated to the Escondido defendants that Aaron exhibited "sociopathic tendencies."

" '[I]f a constitutional claim is covered by a specific constitutional provision... the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' " *County of Sacramento v. Lewis*, 523 U.S. 833, 843, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)). Thus, to the extent that the boys' claims are predicated upon their "strip searches," the constitutionality of which is governed by the Fourth Amendment, such claims must fail. *See Fontana v. Haskin*, 262 F.3d 871 (9th Cir.2001) (claim that plaintiff was sexually harassed by police after arrest is more appropriately analyzed under the Fourth Amendment).

Defendants contend that plaintiffs are also precluded from predicating their § 1983 claims on the interrogations of the boys because the Fifth Amendment covers claims involving coerced confessions. While that is a fair reading of the court's previous order, that order was entered without the benefit of the Supreme Court's recent decision in *Chavez*.

In *Chavez*, the Supreme Court recognized the applicability of the Fourteenth Amendment substantive due process clause to claims based upon the manner of an interrogation. As the plurality explained, the Fourteenth Amendment substantive due process clause "would govern the inquiry" in cases involving "police torture or other abuse that results in a confession...." 538 U.S. at ——, 123 S.Ct. at 2004 (Thomas, J.). Although this plurality did not find that the Fourteenth Amendment substantive due process clause was violated under the facts of that case, five justices remanded the case to the Ninth Circuit to address the defendant's due process claim based on the manner of his interrogation.[33] In light of *Chavez*, *Lewis* cannot be read as precluding plaintiffs from predicating their due process claims on the manner of the boy's interrogation.

Although much time and analysis could be spent on the historical development of

Asserted by Plaintiffs Stephen Crowe, Cheryl Crowe, Judith Kennedy, Shannon Crowe, Margaret Susan Houser, Gregg Houser, Michael Lee Treadway and Tammy Treadway p. 21:14–16 ("In this case, given the outrageous and shocking conduct perpetrated by McDonough in his interrogations of the boys, they, and their families, may proceed under both the Fifth and Fourteenth Amendments."); Treadway Plaintiffs' Points and Authorities in Opposition to the Escondido Defendants' MSJ or in the Alternative, Partial Summary Judgment p. 30:19–22 ("Here, the Escondido Defendants engaged in outrageous conduct as set forth above (the facts and circumstances surrounding his interrogations) and by making Joshua submit to semi-nude photographs,

almost three weeks after Stephanie's body had been found."); Houser Plaintiffs' Memorandum of Points and Authorities in Opposition to the Escondido Defendants' MSJ or in the Alternative, Partial Summary Judgment, of The Housers' Claims pp. 32–33 (referring to the photographing and interrogation of Aaron as behavior in violation of the Fourteenth Amendment due process clause).

33. On remand, the Ninth Circuit concluded that the defendant was not entitled to qualified immunity because the defendant's conduct was shocking to the conscience and a reasonable officer would have known that such a manner of interrogation was a violation of the due process clause.

the Fourteenth Amendment right to substantive due process, what matters here is that "the element of arbitrary conduct shocking to the conscience [is] necessary for a [substantive] due process violation." *Lewis,* 523 U.S. at 836, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). As the Ninth Circuit explained in *Fontana v. Haskin,* 262 F.3d 871, 882 n. 7 (9th Cir.2001):

> Under the Fourteenth Amendment's due process prong, we use the "shocks the conscience" test. *County of Sacramento v. Lewis,* 523 U.S. 833[, 118 S.Ct. 1708, 140 L.Ed.2d 1043] [parallel citations omitted] (1998). *The threshold question is 'whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' Id.* at 848 n. 8, 118 S.Ct. 1708.

(emphasis added); *see also Chavez,* 538 U.S. at ——, 123 S.Ct. at 2005 (Thomas, J.) ("Convictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience' violate the Due Process Clause.") (quoting *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952)).

■ A review of Supreme Court case law reveals that an individual must demonstrate more than that police conduct resulted in an involuntary statement to make out a Fourteenth Amendment substantive due process claim. For example, in the classic case of *Rochin,* the Supreme Court concluded that the conduct of the police shocked the conscience, and that the use of the evidence at trial violated the defendant's Fourteenth Amendment right to due process, where the police directed a doctor to force an emetic solution through a tube into the defendant's stomach against his will to obtain evidence.[34] The

Supreme Court, which throughout its opinion focused on the physical brutality of the police conduct, noted that the methods by which the evidence was obtained were "too close to the rack and the screw to permit of constitutional differentiation." *Rochin,* 342 U.S. at 172, 72 S.Ct. 205. Similarly, the plurality in *Chavez* noted that the Fourteenth Amendment substantive due process clause remains available in cases involving *"police torture or other abuse that results in a confession .... "* 538 U.S. at ——, 123 S.Ct. at 2004 (Thomas, J.) (emphasis added).

■ In contrast, in *Moran v. Burbine,* 475 U.S. 412, 433–434, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) the court concluded that the failure of the police to inform a suspect of efforts of an attorney, who had been retained by defendant's sister without his knowledge, to reach him while he was being interrogated fell "short of the kind of misbehavior that so shocks the sensibilities of civilized society" so as to violate the Fourteenth Amendment due process clause. Thus, it is clear that the police can engage in at least some deceptive and coercive behavior during an interrogation without running afoul of the Fourteenth Amendment.

It should be noted that cases such as *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) are not to the contrary. The issue in *Spano* was whether *the admission of a coerced confession at trial* was a violation of the defendant's Fourteenth Amendment right to due process. *Spano* did not hold that the police violate the Fourteenth Amendment substantive due process clause merely by procuring a coerced confession.

---

**34.** Although the Rochin court did not speak specifically in terms of "substantive" due process, it is nonetheless understood that the Rochin decision was based in substantive due process law. *See Hammer v. Gross,* 884 F.2d 1200, 1203 (9th Cir.1989).

Having viewed the videotaped interviews and interrogations of Joshua Treadway and Aaron Houser in their entirety, and having also reviewed the transcripts thereof, the court concludes that defendants' behavior during the interviews and interrogations, although not commendable, was not "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Fontana,* 262 F.3d at 882 n. 7. While it cannot be forgotten that the boys were juveniles at the time of the interrogations, and while some of the interrogations were long, the manner of the interrogations was neither egregious, outrageous, nor shocking. This is not a case of physical or psychological torture. Defendants never yelled at the boys or even raised their voice. The boys were given food and water and bathroom breaks, even if not always immediately. Although the police may have lied at times, such conduct is not outrageous and, in fact, does not even necessarily amount to coercive conduct. *See Pollard v. Galaza,* 290 F.3d 1030, 1034 (9th Cir.2002) ("[W]e have explained that misrepresentations made by law enforcement in obtaining a statement, while reprehensible, does not necessarily constitute coercive conduct."); *see also United States v. Orso,* 266 F.3d 1030, 1039 (9th Cir.2001) (*en banc*). Similarly, it is not outrageous that defendants attempted to extract confessions from the boys by telling them that they could get treatment rather than jail if they confessed given that the Ninth Circuit recently found that similar statements do not even rise to the level of being coercive. *See Cunningham v. City of Wenatchee,* 345 F.3d 802, 810 (9th Cir.2003) ("Perez's suggestion that Cunningham's cooperation could lead to treatment rather than prison is also not coercive."). Moreover, although the boys became emotional at times during the questioning, the use of questions that elicit an emotional response does not transform the interrogation into one that "shocks the conscience." *Cf. Id.* ("Perez's questions may have unsettled Cunningham, but mere emotionalism and confusion do not invalidate confessions."). Finally, although defendants employed a "good cop/bad cop" approach during some of the interviews, such a manner of interrogation is relatively common and certainly not shocking, even when juveniles are involved.

Specifically with respect to Aaron Houser, the first questioning was approximately an hour and twenty minutes long. In the videotape, Aaron Houser appears as a confident young man. No aspect of this questioning could be considered coercive, let alone shocking. Although the second questioning was approximately 9 and 1/2 hours long, this fact, even when considered in combination with the above facts, does not render the questioning "egregious," "outrageous," or "shocking."

With respect to Joshua Treadway, the court notes that the length of the questioning was due in large part to the fact that Joshua Treadway continued throughout the questioning to give more and more details regarding the crime, which in turn led to more and questions. The fact that defendants continued to question Joshua Treadway as he slowly gave what appeared to be more and more clues regarding the murder can hardly be deemed "shocking to the conscience." Moreover, Joshua Treadway's demeanor at the end of the questioning also supports the conclusion that defendants did not engage in shocking behavior. For example, at the end of the questioning on January 28, Joshua Treadway stated "Not only do I feel like I'm okay, but I feel like I've accomplished... I feel like I've accomplished something with all this." *See* Transcript of Police Interview of Joshua Treadway dated 1–27–98 p. 289:49. He later stated "I told all that I knew. And I feel good to have that off my chest." *Id.*

p. 289: 15–16. Moreover, at the very beginning of the questioning on February 10, Joshua Treadway stated that after the last questioning he felt as if he had "got[ten] rid of a heavy load" and that he felt "relieved." *See* Transcript of Interrogation of Joshua Treadway dated 2–10–98 p. 8: 8–9, 11. These are not the statements of someone who has undergone an interrogation whose manner was shocking.

Importantly, the facts surrounding the questioning of Joshua Treadway and Aaron Houser are quite distinct from the facts surrounding the interrogation in *Chavez.* As in *Rochin,* the police conduct in *Chavez* was "brutal." *See Chavez,* 538 U.S. at ——, 123 S Ct. at 2010 (Stevens, J., concurring in part and dissenting in part). "The District Court found that Martinez 'had been shot in the face, both eyes were injured; he was screaming in pain, and coming in and out of consciousness while being repeatedly questioned about details of the encounter with the police.'" *Chavez,* 123 S.Ct. at 2017 (Kennedy, J. concurring in part and dissenting in part). At least three Justices concluded that the record supported a finding that the defendant police officer intended to exploit the plaintiff's physical pain and that the plaintiff "thought his treatment would be delayed, and thus his pain and condition worsened, by refusal to answer questions." *Id.* at ——, 123 S.Ct. at 2017. The interviews and interrogations in the present case, while not necessarily pleasant, lack such a brutal nature.

In addition, there is nothing shocking about the fact that the police enlisted Joshua Treadway to make a phone call to Aaron Houser in an attempt to elicit incriminating statements from him. Nor is defendant Blum's comparison of Aaron to Charles Manson or his statement regarding Aaron's psychological state the type of behavior that is so shocking that it violates the Fourteenth Amendment.

In summary, the manner in which Joshua Treadway and Aaron Houser were interrogated does not approach the type of brutal police conduct that has been found in other cases to be "shocking" and to therefore violate the Fourteenth Amendment substantive due process clause. Consequently, defendants did not violate Joshua Treadway's and Aaron Houser's Fourteenth Amendment rights to substantive due process. Moreover, even if it were determined that defendants' conduct did violate the boys' Fourteenth Amendment substantive due process rights, a reasonable officer would not have known that the interrogations of the boys amounted to a violation of their Fourteenth Amendment rights to substantive due process given that the interrogations lacked the brutality that has previously marked the police conduct found by the courts to be "shocking to the conscience." Accordingly, defendants are entitled to summary judgment with respect to Joshua Treadway's and Aaron Houser's claims for violation of the Fourteenth Amendment substantive due process right to be free of government conduct that "shocks the conscience."

The parents of Joshua Treadway and Aaron Houser also bring claims for violation of the Fourteenth Amendment substantive due process clause. The Treadway and Houser parents have failed to identify any conduct on the part of defendants that would support their claims other than the conduct identified in support of the Joshua and Aaron's claims. As noted *supra,* such conduct cannot support a Fourteenth Amendment substantive due process claim. Accordingly, even if such a claim can otherwise be predicated upon conduct directed at another, because defendants' conduct toward Joshua and Aaron was does not "shock the conscience" for purposes of the Fourteenth Amendment, defendants are entitled to summary judg-

ment with respect to the Treadway and Houser parents' claims as well.

## B. The Crowe Plaintiffs' Claims

Defendants Blum, McDonough and Sweeney move for summary judgment with respect to the Crowe plaintiffs' claims.

The Crowe plaintiffs claims' against defendants Blum and McDonough appear to be predicated upon the conduct of Michael's interrogation. A review of the record reveals no concrete evidence of a conspiracy encompassing the violation of Michael Crowe's Fourth Amendment right to be free of government conduct that "shocks the conscience" of which these defendants were a part.

Moreover, neither defendant himself directly engaged in conduct that "shocks the conscience." The purpose of an interrogation is to procure a confession. Therefore, it does not "shock the conscience" that defendant Blum provided the police with advice regarding how to best procure a confession from Michael Crowe based on Michael's psychological makeup where there is no evidence that defendant Blum advised using the type of "brutal" techniques that have been held to violate the Fourteenth Amendment substantive due process clause. Moreover, assuming, as plaintiffs contend, that defendant McDonough lied to Michael during his interrogation, as discussed *supra*, it is not necessarily coercive, let alone outrageous, for a police officer to lie to a suspect during an interrogation. *See Pollard*, 290 F.3d at 1034; *Orso*, 266 F.3d at 1039. Because defendant Blum and Mc-Donough did not engage in behavior that "shocks the conscience" so as to support a claim for violation of the Fourteenth Amendment substantive due process clause, these defendants are entitled to summary judgment.

Because defendant Sweeney has failed to address the conspiracy allegations leveled against him, his motion for summary judgment with respect to this claim is denied.

## IV. Fifth Claim for Relief—Fourteenth Amendment Substantive Due Process (Deprivation of Familial Companionship)

The boys and their parents [35] allege that by arresting the boys without probable cause, which resulted in the separation of the boys from their families for a period of time, defendants Blum, Wrisley, Sweeney, Claytor, McDonough, and Anderson [36] wrongfully deprived them of their right to familial companionship in violation of the Fourteenth Amendment substantive due process clause.

 A substantive due process claim for deprivation of the right to familial companionship is recognized where the deprivation is the result of "unwarranted" governmental interference. *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987). As discussed *supra*, Joshua Treadway's and Aaron Houser's arrests were supported by probable cause. Thus, the state's interference with the familial relationships of the Treadways and Housers was not "unwarranted," and the Treadway plaintiffs' and Houser plaintiffs' claims necessarily fail. *See Schaefer v. Goch*, 153 F.3d 793, 799 (7th Cir.1998) ("Because we

---

**35.** The court previously dismissed Shannon Crowe's and Judith Kennedy's claims for deprivation of companionship on the ground that as Stephanie's sister and grandmother, respectively, neither had the requisite rela-

tionship with Stephanie to sustain such a claim. *See* July 26, 2000 Order pp. 13:9–14:1.

**36.** Defendant Stephan was dismissed from this count by the Court in its July 26, 2000 order.

have concluded that Sergeant Goch did not violate Kathy Nislowski's rights under the Constitution, her parents' claims based on the loss of her society and companionship necessarily fail as well.").

Moreover, even if Joshua Treadway's and Aaron Houser's arrests had not been supported by probable cause, a reasonable officer could have believed that they were supported by probable cause. Therefore, defendants would be entitled to qualified immunity under the second prong of the *Saucier* test because a reasonable officer would not have known that these arrests constituted an "unwarranted" interference with the right of companionship which would support a substantive due process claim.

Accordingly, all of the defendants are entitled to summary judgment with respect to the Treadways' and Housers' Fourteenth Amendment claims for deprivation of companionship.

■■■ With respect to the Crowes' claims for deprivation of companionship, the Escondido defendants do not argue that there was probable cause to arrest Michael Crowe or that the Crowes did not suffer a deprivation of the constitutional right to familial companionship; rather, they argue that this right was not clearly established and therefore a reasonable officer at the time of Michael Crowe's arrest would not have known that it would violate this right to arrest Michael without probable cause.

As noted *supra,* "[w]hether the law was clearly established is a pure question of law for the court to decide." *Carnell,* 74 F.3d at 978. The clearly-established inquiry "must be undertaken in light of the specific context of the case, *not as a broad general proposition* ...." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151 (emphasis added). Thus, "[t]he relevant, dispositive inquiry" is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151; *see also Cruz v. Kauai County,* 279 F.3d 1064, 1069 (9th Cir.2002) ("The right must be established at more than an abstract level: it 'must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' ") (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. There is a common sense element to this test. *Jensen v. City of Oxnard,* 145 F.3d 1078, 1086 (9th Cir. 1998) ("It is clearly established both by common sense and by precedent").

Clearly, at the time of Michael Crowe's arrest, both the Ninth Circuit and the Supreme Court had recognized that parents and children have a constitutional right in maintaining a familial relationship. *See Kelson v. City of Springfield,* 767 F.2d 651, 654 (9th Cir.1985) ("The Supreme Court has repeatedly reaffirmed the existence of a constitutional right to the maintenance of a parent-child relationship."); *Smith,* 818 F.2d at 1418 (children have a constitutionally protected liberty interest in their relationships with their parents), *overruled on other grounds by Hodgers–Durgin v. de la Vina,* 199 F.3d 1037 (9th Cir.1999). However, the relevant issue is whether it was clearly established at the time of Michael Crowe's arrest that this constitutional right is violated when the police arrest a child without probable cause. *See Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.").

Although defendants may be correct that this issue has not been addressed by the Supreme Court, Ninth Circuit law can "clearly establish" the law for qualified immunity purposes. *See Kirkpatrick v. City of Los Angeles*, 803 F.2d 485, 490 (9th Cir.1986) ("In the absence of binding precedent from this court *or* the Supreme Court, we look to decisions from other courts *to* determine if the right was clearly established.") (emphasis added). At the time of the arrest of Michael Crowe, the law of this Circuit was that children and parents have an interest in companionship that constitutes a cognizable liberty interest and that the "unwarranted" interference with this liberty interest due to the "affirmative abuse of government power" rises to the level of a substantive due process violation. *See id.* at 1418. Although in *Smith* the "affirmative abuse of government power" was the use of excessive force during an arrest, the arrest of an individual without probable cause certainly arises to the level of an "affirmative abuse of government power," and a reasonable officer would have known as much.

Although defendants argue that it was not clearly established that the right to companionship is violated by a wrongful arrest because cases at the time of Michael Crowe's arrest involving police officers only involved the permanent, rather than temporary, deprivation of this right, defendants have failed to demonstrate that this distinction is sufficiently significant that a reasonable police officer could have believed that a temporary deprivation does not violate this right. Although the wrongful conduct in *Smith* resulted in death, defendants have failed to identify any language in *Smith* which suggests that the Ninth Circuit's recognition of the validity of the plaintiff's claim was predicated upon the fact that the wrongful use of government power resulted in a permanent deprivation of the right to companionship, and this court can find none.

Moreover, although *Ovando v. City of Los Angeles*, 92 F.Supp.2d 1011 (C.D.Cal. 2000) was decided after the relevant events in the present case and is not evidence of the state of the law at the time of Michael Crowe's arrest, the district court's reasoning in *Ovando* is consistent with this court's conclusion that it was not reasonable at the time of Michael Crowe's arrest for a police officer to believe that it was constitutionally permissible to temporarily interfere with the right of familial companionship by means of an unlawful arrest.

In *Ovando*, a daughter brought a civil rights action after her father was released from prison after being identified as one of the victims of the now-notorious Los Angeles Police Department ("LAPD") "Rampart" scandal, which involved "a wide variety of misconduct by LAPD officers including the shooting of unarmed suspects, the planting of evidence to justify those shootings, the preparation of false police reports to cover up the misconduct and the presentation of perjured testimony resulting in the false convictions and imprisonment of a number of innocent citizens." 92 F.Supp.2d at 1014. The daughter claimed that her constitutional right to familial association was violated by both the wrongful imprisonment of her father for almost three years and by the fact that he was rendered a paraplegic and suffered severe, permanent brain damage arising out the use of force by police.

The district court, recognizing that "a child has a substantive due process right in her relationship with her parents which may be vindicated through a Section 1983 action," considered the scope of that right. *Id.* at 1018. The defendants argued that the daughter had failed to state a claim for deprivation of companionship because the deprivation was not "permanent." The district court rejected this argument, explaining that it "finds no support in the

case law." *Id.* at 1019. As the district court explained:

There is nothing in *Smith* that suggests that the holding is limited to wrongful death cases. Rather, the Court held simply that the liberty interest protected by the Fourteenth Amendment is the right to be free from State interference with the companionship and society of one's parent. *Smith,* 818 F.2d at 1419. Nowhere in its opinion did the Court indicate that a deprivation of a duration shorter than the entirety of the child's life was not a "deprivation" cognizable under Section 1983, and this Court can find no principled basis for drawing such a distinction. Here, the unlawful imprisonment of Destiny's father constituted a complete deprivation of his companionship and society for the term of his imprisonment. While Destiny's father's absence may have been "temporary" in the sense that it did not last for the entirety of her life, Destiny's relationship with her father was permanently severed during that interval—those three years can never be retrieved. In that sense it was a temporary, but total, deprivation of a right recognized under the Fourteenth Amendment. *See Sniadach v. Family Finance Corp.,* 395 U.S. 337, 340, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1969) (prejudgment garnishment of wages without notice and prior hearing violated due process where deprivation of property is temporary but total).

*Id.* at 1019 (internal footnote omitted).

In determining that the right asserted by the Crowes was clearly established, the court also finds significant the case of *Morrison v. Jones,* 607 F.2d 1269 (9th Cir.1979). In that case, a mother, a German alien residing in the United States, brought an action after her minor son, also a German alien, was taken from Riverside General Hospital and transported by the county to Germany to reside with his grandparents, with whom he had resided

before coming to the United States to be with his mother. Within several months of being notified that her son had been returned to Germany, the mother filed an action in federal court against, *inter alia,* the Director of Public Social Services, who requested that the County Board of Supervisors for Riverside County approve funds to transport the boy to Germany; the members of the County Board of Supervisors for Riverside County, who approved the funds; the Department of Public Social Services for the County of Riverside; and the Director of Child Psychiatry of the In-Patient Unit, Riverside General Hospital, who allegedly recommended to the Board that the boy be sent to Germany because he was taking up valuable bed space.

The defendants argued, *inter alia,* that the mother did not have standing to sue because she was merely asserting the rights of her son. The Ninth Circuit rejected this argument explaining that the mother

is asserting her interest as the mother of the child to preserve her access to the child and her access to effective judicial relief, which, she alleges, the defendants' conduct destroyed. The defendants' alleged actions unquestionably caused injury to Morrison with respect to her relationships with her son. Those interests, based on familial concepts, recognized by custom and practice for generations, are protected under the Constitution.

*Id.* at 1275 (citations omitted). Defendants, recognizing that *Morrison* is a case dealing with a "less than permanent" deprivation of the right to companionship, contends that it is distinguishable because it dealt with such a deprivation "in the context of the *procedural* due process ramifications of *direct* interference with family relationship." Memorandum of Points and Authorities in Support of De-

fendant Barry Sweeney's MSJ or in the Alternative, Partial Summary Judgment p. 15:3–5 (emphasis added). Defendants' attempt to distinguish *Morrison* is unavailing for two reasons.

First, the Ninth Circuit in *Morrison* held that the plaintiff stated a claim for relief "based upon her constitutionally secured rights to procedural due process of law *and her substantive familial rights* that have long been considered the 'basic civil rights of man.'" 607 F.2d at 1276 (citing *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)) (emphasis added). Therefore, Morrison did not, as defendants suggest, involve only a procedural due process claim.

Second, it is irrelevant that *Morrison* involved "direct interference with the family unit, with an intent to disrupt the family unit in order to protect the children" rather than a deprivation "as an incidental by-product of police action"[37] given that the *Smith* case recognized a substantive due process claim where the deprivation of companionship was the "incidental by-product" of the use of excessive force by the police.

Finally, defendants rely on case law from other circuits in an attempt to demonstrate that the law in this area was not clearly established; however, where the law is clearly established in the Ninth Circuit, the court need not look to other circuits. *See Kirkpatrick,* 803 F.2d at 490 ("*In the absence of binding precedent from this court or the Supreme Court,* we look to decisions from other courts to determine if the right was clearly established.") (emphasis added).

Having determined that defendants are not entitled to qualified immunity with respect to the Crowe's claims for violation of the right to companionship, the court turns

to additional arguments brought by specific defendants.

Defendants Blum, McDonough and Sweeney each contend that they are entitled to summary judgment with respect to all of the plaintiffs' claims for deprivation of companionship because they were not involved in the arrests of the boys.

 As noted in section I.A. *supra,* it is undisputed that defendant Blum did not himself participate in the arrests of the boys or the searches of their residences, and there is no evidence from which a reasonable factfinder could find that defendant Blum had any control over the other defendants' decision to conduct the arrests that underlie this claim. Accordingly, as a matter of law, defendant Blum was not the proximate cause of any deprivation of companionship that plaintiffs may have suffered and therefore cannot be held liable with respect to this claim. *See Franklin,* 312 F.3d at 445–446; *King,* 782 F.2d at 829.

 As noted in section I.B. *supra,* it is undisputed that defendant McDonough did not arrest the boys and was not involved in the decision to arrest the boys. Moreover, although a reasonable factfinder could find that defendant McDonough was involved in a conspiracy regarding the interrogation of the boys, there is no evidence from which a reasonable factfinder could find that defendant McDonough was a part of a larger conspiracy involving the arrest and prosecution of the boys. Because, as set for in section I.B., *supra,* defendant McDonough cannot be held liable for the boys' arrests, he cannot be held liable for the deprivation of companionship arising out of the boys' arrests.

---

**37.** Memorandum of Points and Authorities in Support of Defendant Barry Sweeney's MSJ or in the Alternative, Partial Summary Judgment p. 15:9–13.

On the other hand, as noted in section I.C., *supra,* defendant Sweeney has failed to adequately demonstrate that he cannot be held liable for the boys' arrests. Accordingly, although he is entitled to summary judgment with respect to the Treadways' and Housers' claims for violation of the right to companionship because Joshua Treadway's and Aaron Houser's arrests were supported by probable cause, defendant Sweeney has failed to demonstrate that he is entitled to summary judgment with respect to the Crowes' claims on the basis that he was not "involved" in Michael Crowe's arrest.

## V. Sixth and Tenth Claims for Relief— § 1983 defamation plus and state law defamation

The boys bring a state law claim for defamation as well as a § 1983 claim predicated upon defamation against defendants Stephan, Blum and Sweeney.

### A. Defendant Stephan

Defendant Stephan took over as the prosecutor assigned to prosecute the boys in June 1998. Defendant Stephan handled the 707 hearings, the pretrial motions (including the suppression motions) and prepared for trial against Joshua Treadway. On the eve of Joshua's trial, traces of Stephanie's blood were found on Tuite's red sweatshirt. The District Attorney's Office subsequently moved to dismiss the charges against the boys. The superior court dismissed the charges on February 25, 1999.

After the charges against the boys were dismissed, then-District Attorney Paul Pfingst requested that defendant Stephan appear on the "48 Hours" news program. Defendant Stephan sought the advice of the in-house ethics advisor, Brian Michaels, who told her that she could ethically appear on the show as long as she referenced the public record. *See* Stephan Decl. ¶ 5; Brian Michaels Decl. ¶ 5; Ste-phan DT pp. 32:16–33:18; 34:7–35:5; 35:10–23 (Exhibit 9, NOL of Exhibits in Support of Defendant Summer Stephan's MSJ / Special Motion to Strike / Request for Attorney Fees and Costs).

Defendant Stephan and the District Attorney's media advisor, Gayle Falkenthal, met with a "48 Hours" reporter. Defendant Stephan answered questions during a two-hour, twenty-minute interview that was videotaped. Two minutes and nine seconds of this interview was used in the "48 Hours" program. The statements defendant Stephan made during this interview are the statements upon which the boys' defamation claims are predicated.

### 1. State Law Defamation

California Civil Code § 44 defines "defamation" as either libel or slander. California Civil Code § 46 provides:

Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which:

1. Charges any person with crime, or with having been indicted, convicted, or punished for crime;

2. Imputes in him the present existence of an infectious, contagious, or loathsome disease;

3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits;

4. Imputes to him impotence or a want of chastity; or

5. Which, by natural consequence, causes actual damage.

If a statement falls within § 46(1)-(4), it is considered defamatory per se. *See Rodriguez v. Panayiotou,* 314 F.3d 979, 983 (9th Cir.2002).

██ The assertions of defendants Sweeney and Blum to the contrary notwithstanding, whether a statement is defamatory does not depend on whether it can be characterized as an opinion. Although support for such a position can be found in *Tschirky v. Superior Court,* 124 Cal.App.3d 534, 539, 177 Cal.Rptr. 357 (1981), later California cases have eschewed this position in light of the Supreme Court case of *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). As the California court of appeal stated in *Kahn v. Bower,* 232 Cal.App.3d 1599, 284 Cal.Rptr. 244 (1991), "the dispositive question after *Milkovich* is 'whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion.' " *Id.* at 1607, 284 Cal.Rptr. 244 (quoting *Moyer v. Amador Valley J. Union High School Dist.,* 225 Cal.App.3d 720, 724, 275 Cal.Rptr. 494 (1990)); *see also Gilbrook,* 177 F.3d at 861-2 ("[A] court reviewing a claim of defamation must ask a threshold question: Could a reasonable factfinder conclude that the contested statement implies an assertion of objective fact?").

"The question whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court." *Kahn,* 232 Cal.App.3d at 1608, 284 Cal.Rptr. 244 (1991). It is also for the court to determine whether a statement is reasonably susceptible of a defamatory interpretation. *See id.* If the court determines that the statement is reasonably susceptible of a defamatory interpretation, "it is for the jury to determine whether a defamatory meaning was in fact conveyed to the listener or reader." *Id.*

The boys contend that defendant Stephan's statements are defamatory per se pursuant to § 46(1) because they charge the boys with killing Stephanie. As noted *supra,* "a court reviewing a claim of defamation must ask a threshold question: Could a reasonable factfinder conclude that the contested statement implies an assertion of objective fact?" *Gilbrook,* 177 F.3d at 861-2. Only if a contested statement implies a false assertion of objective fact does it fall outside of the protection of the First Amendment. *See Partington v. Bugliosi,* 56 F.3d 1147, 1153 (9th Cir.1995). As the Ninth Circuit has explained:

> To make that determination, this court has adopted a three-part test, in which *we must examine the totality of the circumstances in which the defendant made the challenged statement.* First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Gilbrook,* 177 F.3d at 862 (emphasis added). Similarly, in determining whether a statement is "sufficiently communicative of provable falsity or actual fact to subject the defendant to liability," California courts consider the "totality of the circumstances," including the language of the statement and the context in which the statement was made. *See Kahn,* 232 Cal. App.3d at 1608, 284 Cal.Rptr. 244. " 'This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to

whom the publication was directed.'" *Id.* at 1608, 284 Cal.Rptr. 244 (quoting *Moyer,* 225 Cal.App.3d at 724, 275 Cal.Rptr. 494 (in turn quoting *Baker v. Los Angeles Herald Examiner,* 42 Cal.3d at 260–1, 228 Cal.Rptr. 206, 721 P.2d 87)).

Because the statements upon which the boys' defamation claims are predicated are statements in "sound bites" which were taken from an extensive interview, it is important to note that "defamatory meaning must be found, if at all, in a reading of the publication as a whole.... Defamation actions cannot be based on snippets taken out of context." *Kaelin v. Globe Communications Corp.,* 162 F.3d 1036, 1040 (9th Cir.1998); *see also Selleck v. Globe International Inc.,* 166 Cal.App.3d 1123, 1131, 212 Cal.Rptr. 838 (1985) (court must examine newspaper's headlines, caption, and article as a whole); *Corman v. Blanchard,* 211 Cal.App.2d 126, 131–2, 27 Cal.Rptr. 327 (1962) (examination of entire allegedly defamatory pamphlet necessary "to understand its import and the effect which it was intended to have on the reader"). Importantly, an individual who gives an interview "is not responsible for the subsequent editing" of the interview but rather is responsible only for statements made "in their full and complete form, not the sound bites they became." *Metabolife Int'l, Inc. v. Wornick,* 264 F.3d 832, 847 (9th Cir. 2001).

Finally, not only must the statement imply an assertion of objective fact, but the assertion must be false, because in a defamation action, "the truth of the offensive statements or communication is a complete defense against civil liability ...." *Ringler Associates Inc. v. Maryland Cas. Co.,* 80 Cal.App.4th 1165, 1180, 96 Cal.Rptr.2d 136 (2000) (quoting *Smith v. Maldonado,* 72 Cal.App.4th 637, 646, 85 Cal.Rptr.2d 397 (1999)); *see also Monterey Plaza Hotel v. Hotel Employees & Restaurant Employees,* 69 Cal.App.4th 1057, 1064, 82 Cal.Rptr.2d 10 (1999) (" 'The *sine*

*qua non* of recovery for defamation ... is the existence of falsehood.'") (quoting *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 283, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974)). "Significantly, ... the defendant need not justify the literal truth of *every word* of the allegedly defamatory matter. It is sufficient if the *substance* of the charge is proven true, irrespective of slight inaccuracy in the details, 'so long as the imputation is substantially true so as to justify the 'gist or sting' of the remark.'" *Ringler Associates Inc.,* 80 Cal.App.4th at 1180–81, 96 Cal.Rptr.2d 136 (quoting *Campanelli v. Regents of University of California,* 44 Cal.App.4th 572, 581–582, 51 Cal.Rptr.2d 891 (1996)).

With this legal framework in mind, the court turns to the statements identified in plaintiffs' opposition as the statements upon which plaintiffs' claims are predicated.

*(a) "Her brother [Michael] hated her [Stephanie]. He hated the attention that she was getting."*

▆ This is Stephan's statement as aired on 48 Hours. Plaintiffs contend that this statement is false, as evidenced by Michael Crowe's declaration, in which he states that he did not hate his sister and in fact loved his sister. However, the preliminary issue, which is one for the court, is whether the statement is susceptible of a defamatory meaning pursuant to § 46(1). *See Kahn,* 232 Cal.App.3d at 1608, 284 Cal.Rptr. 244.

As noted, in deciding whether a statement is defamatory, one cannot focus on snippets taken out of context. *See Kaelin,* 162 F.3d at 1040. The above statement is a portion of a sentence that comes from the following colloquy:

Q. What was the motive for murdering Stephanie Crowe?

A. The motive *as laid out by the confession*[38] *and as corroborated by other evidence* was that Stephanie was such a delightful girl. She was an angel by all accounts. She—just to look at her face while alive is to smile. She's the kind of person that brings out everything good and touched people. She was a wonderful little girl.

The motive *as laid out by the confession*—it's not my motive that I created. You just go by the evidence that you have—is that her brother hated her, that he hated the attention that she was getting. He hated Stephanie.

Transcript of 48 Hours Interview, pp. 34:18–35:3 (Exhibit 12, NOL of Exhibits in Support of Defendant Summer Stephan's MSJ/Special Motion to Strike/ Request for Attorney Fees and Costs) (emphasis added).

Regardless of whether Michael Crowe hated or loved his sister, defendant Stephan's actual statement, considered in context, is not a defamatory statement within the meaning of the California Civil Code § 46(1) because this statement is not reasonably susceptible of the interpretation that Michael killed Stephanie Crowe. While this statement is reasonably susceptible of being interpreted as a statement *that there was evidence* that Michael Crowe had a motive for killing Stephanie and that the motive was that he hated her, such a statement does not fall within § 46(1), as such a statement is distinct from a statement charging Michael Crowe with Stephanie's killing. Moreover, it is undisputed that there was evidence that Michael Crowe had a motive for killing Stephanie, regardless of whether he actually held that motive. Accordingly, defendant Stephan is entitled to summary judg-

ment to the extent that plaintiffs' claims are predicated upon this statement.

(b) *"The behavior of the brother [Michael] seemed in contrast to the rest of the family. He was playing with some hand held game while the rest of the family was grieving."*

■ This contested statement is not reasonably susceptible of the interpretation that Michael killed Stephanie. Therefore, this statement does not fall within the definition of defamation set forth in Civil Code § 46(1).

(c) *"The motive started out as this hate, but then it turned into a sort of game of, 'Let's plan this out.' 'Let's see if it can be pulled off.' "*

■ In response to the question "He hated her?" defendant Stephan answered as follows:

A. *According to the confession.* I can only go by the evidence that I have at the time. And the evidence that I have is not evidence that I make up. It's evidence that exists, either through the confession, through the computer story,[39] through other avenues where evidence comes about.

*In this case, the confession as well as the computer story as well as other corroborating evidence showed this motive, and then showed that, through the confession, that the motive started out as this hate, but then it turned into sort of a game of let's plan this out. Let's see if it can be pulled off*

. . . .

Transcript of 48 Hours Interview, pp. 37:19–38:6 (emphasis added). The implied

---

**38.** A reading of the entire transcript of defendant Stephan's interview reveals that the confession to which she was referring was that portion of Joshua Treadway's statements to

police that the trial court deemed to be voluntary.

**39.** *See* footnote 5.

assertion of objective fact here is not that Michael Crowe killed Stephanie but that there was a basis for the prosecution because *the confession and other evidence showed* that the motive for the crime started out as hate but that it turned into a game. Such a statement is not a statement within the meaning of § 46(1), because such a statement does not charge the boys with Stephanie's murder. Moreover, it is undisputed that this is what Joshua's confession showed regarding the motive, whether Joshua's confession was true or not. Therefore, defendant Stephan is entitled to summary judgment to the extent that plaintiffs' claims are predicated upon this statement.

*(d) "There's a person that starts the ball rolling. And then you have people who climb onto the ship."*

■■■ The above statement was made during the following colloquy:

Q. But, I mean, it is hard to believe that an older brother could hate his little sister who was, by all accounts, this angel-like child so much that he would recruit his friends, plot out a meticulous killing, carry it out. It's hard to believe.

A. It's very hard to believe, and it would have been, I think, very easy for investigators and police at the time to just try to pin the murder on the transient right away.

I think it would be a lot easier to try to convict a transient who doesn't have a family than it is to try to convict three intelligent young men with families.

. . .

*Now, it's possible that this transient did it. It's possible that the evidence against these three boys will remain and we'll continue to show that they did it.*

*All of those things are possible, and we're ready to accept wherever the evidence takes us.*

Q. But as the evidence back then seems to be falling into place in your mind against these three boys, do you ask yourself, are they all evil? Is it Michael and Joshua and Aaron? How could they all be evil and do this?

A. *Well, we've seen in our system many cases where there's a person that starts the ball rolling and the you have people who climb on to the ship.* Many of the murders are such that not everyone is equally responsible. Legally, everyone is responsible for the murder, but that's the way it is. Sometimes it's peer pressure. Sometimes it's out of loyalty or friendship, or if we were to believe the confession of Joshua Treadway, the one that's been held to be both admissible and absolutely voluntary by the judge, if you were to hear him on videotape calmly relay the reason he went along is for friendship and because he was a little bit afraid of the others. So that's what I have to go on, is the evidence that's there.

Transcript of 48 Hours Interview, pp. 39:10–40:21 (emphasis added).

The boys' contentions to the contrary not withstanding, defendant Stephan did not actually state that one of the boys "started the ball rolling" with respect to Stephanie's murder, nor is her statement susceptible of such an interpretation. As noted *supra*, a speaker's statements must be considered in context. *See Kaelin*, 162 F.3d at 1040; *Selleck*, 166 Cal.App.3d at 1131, 212 Cal.Rptr. 838; *Corman*, 211 Cal. App.2d at 131–2, 27 Cal.Rptr. 327. The question posed to defendant Stephan clearly was not seeking an assertion of objective fact, implied or otherwise, regarding the boys' involvement in the murder but

rather was seeking insight into the thought process of those involved in the investigation and prosecution of the boys. Moreover, immediately prior to answering this question, *defendant Stephan specifically stated that it was possible that Tuite committed the murder.* Transcript of 48 Hours Interview, p. 39:27.

Finally, it should be noted that prior to this particular line of questioning, Stephan had detailed the evidence that was consistent with the boys committing the crime, which included an FBI report,[40] a confession by Treadway,[41] a knife found under Treadway's bed that a leading pathologist concluded was the type of knife used in the killings,[42] and three statements by juveniles with whom Crowe was housed in juvenile hall who had stated that Crowe had confessed to murdering his sister.[43] Read in context, defendant Stephan's statement about the "ball rolling" cannot be interpreted as a statement that the boys committed the murder. Rather, this statement was a generalized statement regarding how it is that individuals one would never expect get involved in horrific crimes, which statement was made in the context of a larger discussion regarding why the investigation focused on the boys.

Because defendant Stephan's statement, considered in context, does not impliedly assert that the boys killed Stephanie Crowe and therefore does not fall within the meaning of Civil Code § 46(1), defendant Stephan is entitled to summary judgment to the extent that the boys' claims are predicated upon this statement.

(e) *"I don't think it's the cause of murder in any way, but I think it shows us a way that minds can come to— to plan an event. And in these games, it happens to usually be an event to kill or destroy the enemy."*

■ Plaintiffs contend that this statement is false because, according to Michael Crowe's declaration, none of the boys were influenced to commit murder by computer games because none of them ever had it in their minds to kill Stephanie or anyone else. Again, however, the preliminary issue, which is one for the court, is whether the statement is susceptible of a defamatory meaning pursuant to § 46(1). *See Kahn*, 232 Cal.App.3d at 1608, 284 Cal. Rptr. 244.

The statement comes from the following colloquy:

Q: How significant were the video games?

A. By themselves, they are not evidence. But as they serve to support and corroborate the confession, they are important.

They serve to show how someone could pull off this murder undetected. You know, the information we had was that these young men practiced on a daily basis killing scenarios and how to beat the enemy and how to be able to pull it off.

**40.** Defendant Stephan's reference to this report can be found on page 15, lines 4–10 of the transcript of her 48 Hours interview. The report is Exhibit 24 to NOL of Exhibits in Support of Defendant Summer Stephan's MSJ / Special Motion to Strike / Request for Attorney Fees and Costs.

**41.** Defendant Stephan's reference to the confession can be found on page 14, lines 13–17 of the transcript of her 48 Hours interview.

**42.** Defendant Stephan's reference to the knife and the pathologist's conclusion can be found on page 14, lines 18–25 of the transcript of her 48 Hours interview.

**43.** Defendant Stephan's reference to the statements by the juveniles housed with Crowe can be found on page 14, lines 26 through page 15, line 4 of the transcript of her 48 Hours interview.

Q: On these video games?

A. On video or Dungeons or Dragons. We were told that they were able to have a scenario that would go on for two months and they're able to keep it all in their own mind, the Dungeons and Dragons killing scenarios.

That showed a level of intelligence and that showed a level of being able to plan and keep information in your mind. And looking at the crime scene and how somebody could commit this murder, be undetected, not leave any evidence and leave undetected seemed to corroborate, fit in and show that this is something that mentally there were capable of doing.

***Again, I'm not saying that they did it at this point. It's an open investigation.***

. . .

I think that the Dungeons and Dragons game, just looking through history, there has been several cases—several murder cases—that have been connected with people playing that game.

. . .

*I don't think it's the cause of murder in any way, but I think it shows us a way that minds can come to plan an event and, in these games, it happens to usually be an event to kill or destroy the enemy.*

Q. So under that scenario, under that early on scenario of the case, this started out as a game and ended up as murder?

A. *According to the confession* . . . .

Transcript of 48 Hours Interview, pp. 48:25–51:4 (emphasis added). Defendant Stephan's statements, read in context, are not defamatory because they cannot be considered as implying the factual assertion that the boys killed Stephanie Crowe. In fact, defendant Stephan was careful during her statements on the topic of

games to specifically state that she was not saying that the boys committed the murder. *See* Transcript of 48 Hours Interview, p. 49:20–21 ("Again, I'm not saying that they did it at this point. It's an open investigation."). Rather, it is clear that Stephan was explaining the thought process of those investigating the murder and the significance she and the investigators placed on the fact that the boys played games such as Dungeons and Dragons. Consequently, defendant Stephan is entitled to summary judgment to the extent that plaintiffs' claims are premised on this statement.

*(f) Statements regarding Tuite*

 During her 48 Hours interview, defendant Stephan made the following statements:

* "All of his [Tuite's] history, including mental history, showed a pattern of someone who cannot focus."

* "This was a highly organized crime. One where someone can stealthily come in, murder a girl in her sleep without anybody waking up. He [Tuite] was not a good candidate for pulling off a crime like this."

* "He [Tuite] wasn't just ignored and put on a shelf. After all, he was brought to the police station. He was interrogated. He was interrogated two times."

* "The shirt was heavily sp-stained. It's a transient's shirt. It's stained—it has stains of blood under three millimeters in diameter."

* "He [Tuite] attempted that burglary using a black plastic fish. That is what this man had as a burglary weapon."

None of these statements are actionable, as none of these statements are reasonably susceptible of the interpretation that *the boys* committed the murder. These state-

ments in no way reference the boys. Moreover, it must, again, be emphasized that whether a statement is susceptible of a defamatory meaning requires an examination of all of the speaker's statements considered as a whole, not on "snippets taken out of context." *Kaelin,* 162 F.3d at 1040; *see also Selleck,* 166 Cal.App.3d at 1131, 212 Cal.Rptr. 838; *Corman,* 211 Cal. App.2d at 131–2, 27 Cal.Rptr. 327. These references to Tuite were made in the context of an interview in which defendant Stephan continually made it clear that she was uncertain as to who had committed the crime and that Tuite remained a suspect. For example, in discussing her belief that the case would have a conclusion, she explained:

> The conclusion might be that the young men will face justice. The conclusion might be that the transient will face justice. It might be that another person will face justice.

Transcript of 48 Hours Interview, p. 6:9–12. When asked about the possible reasons why Stephanie's blood was found on Tuite's red shirt, defendant Stephan answered:

> One, the transient killed Stephanie Crowe, and if he did, then he should be brought to justice and we hope to do that.

Transcript of 48 Hours Interview, p. 11:24–26. Defendant Stephan also specifically stated that she was not saying that Tuite was incapable of committing the crime. Transcript of 48 Hours Interview, p. 33:20–22. Finally, near the end of the interview, when asked whether she believed the boys did it but she just could not prove it, defendant Stephan answered:

> I'm not saying that at all. I am saying that we have to start from the beginning. No one in—the young men, the transient and maybe others out there are potential suspects in this case.

Transcript of 48 Hours Interview, p. 77:23–26.

In sum, defendant Stephan's remarks about Tuite are not "reasonably susceptible of a defamatory meaning," *Kaelin,* 162 F.3d at 1040, as her remarks regarding why Tuite was an unlikely suspect cannot be rationally interpreted as implying that instead it was *the boys* who killed Stephanie. Accordingly, these remarks cannot be the basis for a state law defamation claim, and defendant Stephan is entitled to summary judgment to the extent that plaintiffs' claims are predicated upon these statements.

 Finally, in support of their claims, the boys point to two other statements which defendant Stephan made to "48 Hours" but which were not broadcast. The first such statement was in response to why there wasn't a rush to charge Tuite:

> When we have three juveniles that say that the brother had confessed to them the murder of his sister? Three separate juveniles who tell us that without receiving any benefit. They were on their way out of juvenile hall or already out of juvenile hall, so they were not expecting any favor in return.

Transcript of 48 Hours Interview, pp. 14:26–15:3. The boys contend that this was a false statement because one of the juveniles who told the police that Michael had confessed to the crime was awaiting trial in a double murder in which he had been charged as an adult, and therefore he expected leniency for his testimony. Regardless of the truth of defendant Stephan's statement that none of the juveniles expected any favor in return for their statements to police, this statement is not defamatory within the meaning of Civil Code § 46(1) because it is not a statement charging the boys with a crime but rather

an explanation regarding why someone else was not charged with that crime.

 Finally, the boys point to the following statement by Stephan:

> [T]he most compelling piece of evidence... that made the police focus more on the brother in this case was a statement he made... The brother told his family and told the police that he woke up at 4:30 in the morning and that he turned on his TV light... and that he got out of his room ... and that his sister's door was closed at that time and he saw nothing amiss... The investigation showed that it is pretty much not reasonable that somebody could walk our of their room at 4:30 and not see the body there and that it would not be truthful to say that her door was shut because the evidence shows that her door was open because her body blocked the doorway where it couldn't be closed.

Transcript of 48 Hours Interview, pp. 19:21–20:22.

This statement is not defamatory within the meaning of Civil Code § 46(1) because it is not a statement charging Michael Crowe with Stephanie's murder. Rather, it was a comment on the evidence and the reasoning of the police. Moreover, for reasons set forth in detail in section I.D. *supra*, Michael's statement to the police that he awoke at 4:30 a.m. and saw that Stephanie's door was closed was the most compelling piece of evidence against him, and no reasonable factfinder could find otherwise.

Defendant Stephan seeks summary judgment on the alternative ground that her statements are privileged under California law. Because the court concludes that the challenged statements made by defendant Stephan are not actionable because, as a matter of law, they are not defamatory within the meaning of § 46(1), the court need not address defendant Stephan's arguments regarding privilege.

Finally, because the court grants defendant Stephan's motion for summary judgment, her motion to strike pursuant to California's Anti–SLAPP statute is denied as moot, as is her motion for attorney's fees pursuant to that statute.

### 2. Section 1983 "Defamation Plus"

 In order to maintain a cognizable § 1983 claim based on defamation, a plaintiff must demonstrate the loss of a property or liberty interest rooted in the constitution in conjunction with injury to reputation. *See Cooper v. Dupnik,* 924 F.2d 1520, 1532 (9th Cir.1991), *vacated on other grounds,* 963 F.2d 1220 (9th Cir. 1992). As the Ninth Circuit has explained, a § 1983 claim for defamation-plus may be proved either by demonstrating that the plaintiff suffered an injury to reputation that was inflicted in connection with the violation of a federally protected right or by demonstrating that the plaintiff's injury to reputation caused the denial of a federally protected right. *See Herb Hallman Chevrolet v. Nash–Holmes,* 169 F.3d 636, 645 (9th Cir.1999).

Defendant Stephan is entitled to summary judgment with respect to the boys' § 1983 defamation-plus claims because, as set forth *supra,* as a matter of law her challenged statements were not defamatory. Moreover, even if the above statements could be deemed defamatory, given the painstaking manner in which defendant Stephan attempted to tie her remarks to the evidence of record and consistently indicated that the identify of the murderer was up in the air, no reasonable prosecutor could have believed that she was violating the boys' federal constitutional rights by making the statements uttered by defendant Stephan. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151 (emphasizing that the inquiry regarding whether the law was clearly established "must be undertaken in

light of the specific context of the case, *not as a broad general proposition . . . .*") (emphasis added). Accordingly, defendant Stephan is entitled to summary judgment with respect to the boys' § 1983 defamation-plus claims.

### B. Defendant Blum

Defendant Blum is a private clinical psychologist. Defendant Blum was consulted by defendant Anderson on January 23, 1998 about an interview the police were going to conduct with Michael Crowe. *See* Blum Decl. ¶ 13. Defendant Blum was present during at least portions of plaintiff Michael Crowe's January 23 interview. Defendant Anderson also requested that defendant Blum render an opinion regarding a phone call between Aaron Houser and Joshua Treadway.

Defendant Claytor testified in his deposition in this case that defendant Blum assessed plaintiff Aaron Houser as "exhibiting sociopathic tendencies." *See* Ralph Claytor DT p. 562:10–12 (one of several exhibits attached as Exhibit C to Plaintiffs' Responses to Blum's Separate Statement of Undisputed Material Facts in Support of MSJ, or in the Alternative, Partial Summary Judgment). Defendant Claytor also testified that defendant Blum told the Escondido Police Department that "He is a Charles Manson with an IQ." *Id.* at p. 566:13–17. In addition, defendant Blum admitted in his own deposition that during a phone call with defendant Anderson on January 31, 1998, defendant Blum stated that he thought that plaintiff Aaron Houser was a "Charlie Manson wannabe" and that he was "highly manipulative and controlling." Lawrence Blum DT pp. 34:3–36:7 (attached as Exhibit B to Plaintiffs' Responses to Blum's Separate Statement of Undisputed Material Facts in Support of MSJ, or in the Alternative, Partial Summary Judgment).

#### 1. State law defamation

Because the only allegedly-defamatory statements made by defendant Blum concern Aaron Houser, defendant Blum's motion for summary judgment with respect to Michael Crowe's and Joshua Treadway's defamation claims is granted.

 Plaintiff Aaron Houser contends that the statements that he is a "Charlie Manson wannabe" and "Charles Manson with an IQ" are statements accusing him of Stephanie's murder, and therefore they are defamatory under California Civil Code § 46(1). Defendant Blum moves for summary judgment on the ground that the statements he made are "rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions, or language used in a loose figurative sense which are protected non-actionable opinion." Defendant Lawrence N. Blum's Memorandum of Points and Authorities in Support of MSJ, or in the Alternative, Partial Summary Judgment p. 16:24–26.

As discussed *supra*, a speaker is not protected from a defamation claim simply because a statement is couched in terms of an opinion. *See Kahn*, 232 Cal.App.3d at 1607, 284 Cal.Rptr. 244 (explaining that "'whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion'" is the "dispositive question" in determining whether a statement is defamatory) (quoting *Moyer*, 225 Cal.App.3d at 720, 275 Cal.Rptr. 494). On the other hand, certain types of opinions are not reasonably susceptible to an interpretation which is capable of being proven true and false and therefore are not actionable. In particular, "'rhetorical hyperbole,' 'vigorous epithets[s],' 'lusty and imaginative express[s] of . . . contempt,' and language used 'in a loose, figurative sense'" have all been found to be unactionable statements protected by the First Amendment. *Ferlauto*

*v. Hamsher,* 74 Cal.App.4th 1394, 1401, 88 Cal.Rptr.2d 843 (1999) (quoting *Greenbelt Pub. Assn. v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970)).

Clearly, defendant Blum's figurative statement comparing Aaron Houser to Charles Manson is not a statement resting on an assertion of objective fact that is capable of being proven true or false. Therefore, this statement is not actionable. *See Underwager v. Channel 9 Australia,* 69 F.3d 361, 367 (9th Cir.1995) (statement that plaintiff was "intrinsically evil" was not an assertion capable of verification); *Gilbrook,* 177 F.3d at 862 (reference to plaintiff as a "Jimmy Hoffa" was "the type of 'colorful, figurative rhetoric that reasonable minds would not take to be factual'" and "was not sufficiently susceptible of being proved true or false" and therefore was not actionable) (quoting *Underwager,* 69 F.3d at 367); *Ferlauto,* 74 Cal.App.4th at 1403, 88 Cal.Rptr.2d 843 (use of phrase "Kmart Johnny Cochran" to describe a lawyer was "a lusty and creative expression of contempt, too loose and figurative to be susceptible of being proved true or false").

Moreover, given that defendant Blum, a psychologist, was speaking to police officers who were investigating Stephanie's murder and who had sought defendant Blum's professional advice, the police officers surely would have interpreted this statement as a comment on Aaron Houser's psychological profile and not as a statement that Houser was guilty of Stephanie's murder. *See Kahn,* 232 Cal. App.3d at 1608, 284 Cal.Rptr. 244 (explaining that in determining whether a statement is actionable, California courts consider the "totality of the circumstances," including "'the knowledge and understanding of the audience to whom the publication was directed'") (quoting *Moyer,* 225 Cal.App.3d at 724, 275 Cal.Rptr. 494 (in turn quoting *Baker,* 42 Cal.3d at 260–1,

228 Cal.Rptr. 206, 721 P.2d 87)). *Cf. Weiner v. San Diego County,* 210 F.3d 1025, 1031–2 (9th Cir.2000) (holding that district attorney's statement was not defamatory because district attorney's audience "would likely view his statement as an attempt to explain that it was not because the prosecution did a bad job that the case was lost" and not as a statement that the acquitted defendant was actually guilty). However, a statement regarding Aaron's psychological profile is not defamatory pursuant to § 46(1).

■ Finally, the statement about plaintiff Houser being a "sociopath" is not a statement charging plaintiff Houser with a crime pursuant to § 46(1), and plaintiff Houser fails to identify any other basis for claiming that the comment about him being a sociopath is defamatory.

Accordingly, defendant Blum is entitled to summary judgment with respect to Aaron Houser's defamation claim.

### 2. Section 1983 Defamation–Plus

The court previously ruled that only plaintiff Aaron Houser can potentially state a § 1983 defamation-plus claim against defendant Blum. *See* July 26, 2000 Order p. 15:17–21.

Because the statements made by defendant Blum with respect to plaintiff Aaron Houser are not defamatory under California law, they cannot be the basis of a federal § 1983 "defamation-plus" cause of action. Accordingly, defendant Blum is entitled to summary judgment with respect to this claim brought by Aaron Houser.

### C. Defendant Sweeney

#### 1. Defamation

■ In his motion, defendant Sweeney contends that "[t]he only supposedly defamatory statement attributed to Sweeney

is that he allegedly told an unnamed acquaintance of the Houser family that Aaron was guilty of murdering Stephanie Crowe, and that he vacillated between psycho and normal like a character in the film Primal Fear." Memorandum of Points and Authorities in Support of Defendant Barry Sweeney's MSJ or in the Alternative, Partial Summary Judgment p. 16:13–15. The boys apparently do not dispute that this alleged statement provides the basis for their claims against defendant Sweeney. Because plaintiffs Michael Crowe and Joshua Treadway are not referenced in this statement, defendant Sweeney is entitled to summary judgment with respect to the Michael Crowe's and Joshua Treadway's defamation claims.

Defendant Sweeney contends that the statements he allegedly made against Aaron are not defamatory because they are statements of opinion, not fact. As noted *supra*, the test is not whether Sweeney's statements can be characterized as statements of opinion but rather " 'whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion.' " *Kahn*, 232 Cal. App.3d at 1607, 284 Cal.Rptr. 244 (quoting *Moyer*, 225 Cal.App.3d at 724, 275 Cal. Rptr. 494).

Here, the statement that Aaron Houser was guilty of murdering Stephanie Crowe, even if couched as an opinion, was made to a civilian by a police officer with inside knowledge regarding the investigation of Stephanie's murder. A reasonable factfinder could find that such a statement by such an officer implied a factual assertion which is, theoretically at least, capable of being proven true or false. Accordingly, such statement is actionable, and defendant Sweeney is not entitled to summary judgment with respect to this statement.

■ On the other hand, the statement likening Aaron Houser to the character in Primal Fear is "too loose and figurative to be susceptible of being proved true or false." *Ferlauto*, 74 Cal.App.4th at 1403, 88 Cal.Rptr.2d 843 (reference to attorney as a "Kmart Johnnie Cochran" not actionable); *see also Gilbrook*, 177 F.3d at 862 (reference to plaintiff as a "Jimmy Hoffa" not actionable). Thus, defendant Sweeney is entitled to summary judgment with respect to Aaron Houser's defamation claim to the extent that it is predicated upon this statement.

■ The court notes that plaintiff Houser has failed to oppose defendant Sweeney's motion. The court has the discretion to deem this failure to oppose this motion a consent to its granting, *see* Local Rule 7.1.(f.3.c); however, because defendant Sweeney's analysis regarding the first challenged statement is not supported by the law, the court will not grant the motion on that ground. The court also notes that, in his reply, defendant Sweeney contends that he is entitled to summary judgment because plaintiff Houser has failed to identify "specific facts showing that there is a genuine issue for trial." Rule 56(e); *see also* Rule 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, this argument comes too late. *See Eberle v. City of Anaheim*, 901 F.2d 814, 817 (9th Cir.1990) (refusing to consider argument raised for first time in reply brief). Nowhere in his motion does defendant Sweeney contend that there is an absence of evidence from which a reasonable factfinder could find that he made the statements plaintiff Houser attributes to him. Rather, defendant Sweeney simply argues that as a matter of law the statements attributed to him were not defamatory. Because plaintiff Houser was not placed on notice that he was required in his opposition to come forth with evidence demonstrating that this alleged statement was actually made, it would be inappropri-

ate at this time to grant summary judgment based on his failure to do so.

### 2. Section 1983 "Defamation–Plus"

Because the only allegedly-defamatory statements made by defendant Sweeney pertain to Aaron Houser, defendant Sweeney is entitled to summary judgment with respect to Michael Crowe's and Joshua Treadway's § 1983 defamation-plus claims.

As for Aaron Houser's claim, as noted *supra*, the statement likening Aaron Houser to a character in a movie is not defamatory because it cannot be interpreted as implying a provably false factual assertion. Therefore, plaintiff Aaron Houser's § 1983 defamation-plus claim fails to the extent that it is predicated upon this statement.

■■■ As noted, the statement that Aaron killed Stephanie is a statement upon which a defamation claim may be predicated. However, defendant Sweeney contends that Aaron Houser cannot demonstrate that the alleged injury to reputation resulting from Sweeney's alleged statements was inflicted in connection with a federally protected right or caused the denial of a federally protected right as required by Ninth Circuit case law. *See Herb Hallman Chevrolet v. Nash–Holmes,* 169 F.3d 636, 645 (9th Cir.1999). The requisite connection between the alleged injury to reputation and the denial of a federally protected right is not readily apparent, and plaintiff Aaron Houser has failed to address the existence of such a connection. Accordingly, the court deems plaintiff Houser's failure to address this argument as a concession that he is unable to make this showing. Therefore, defendant Sweeney is entitled to summary judgment with respect to Aaron Houser's § 1983 defamation-plus claim.

## VI. Eighth Claim for Relief—Municipal Liability for Violation of § 1983

### A. City of Oceanside

As explained *supra*, defendant McDonough, an employee of the City of Oceanside, is entitled to summary judgment with respect to all of the plaintiffs' claims because the record is devoid of evidence from which a reasonable factfinder could find defendant McDonough liable for violating the plaintiffs' constitutional rights. Accordingly, the City of Oceanside is entitled to summary judgment as well. *See Quintanilla v. City of Downey,* 84 F.3d 353, 355–6 (9th Cir.1996) (district court did not err in entering judgment on *Monell* claim for the chief of police and city solely on the basis of the jury's finding that the individual officers did not violate plaintiff's constitutional rights); *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) ("[N]either *[Monell]*, nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.")

### B. City of Escondido

The City of Escondido moves for summary judgment, arguing that it cannot be liable for violation of the boys' Fifth Amendment rights. As set forth in section II, *supra*, the boys did not suffer a violation of their Fifth Amendment rights. Accordingly, the City's motion for summary judgment is granted with respect to this claim. *See Quintanilla,* 84 F.3d at 355–6; *Heller,* 475 U.S. at 799, 106 S.Ct. 1571.

## VII. Ninth Claim for Relief—False Arrest/False Imprisonment

The boys bring a state law claim for false arrest/false imprisonment against defendants Wrisley, Claytor, Anderson, Blum, McDonough and Stephan.

### A. Joshua Treadway's and Aaron Houser's Claims

■ Under California law, no cause of action may be brought against a police officer for false arrest or false imprisonment arising out of any arrest when "[t]he arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful." California Penal Code § 847. Penal Code § 836(a)(3) provides that a warrantless arrest is lawful when a police officer has "probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed." As is the case with federal law, California law provides that "the court must look to the facts known to the peace officer at the time of the arrest" in determining whether there is probable cause for a warrantless arrest. *Giannis v. City and County of San Francisco,* 78 Cal.App.3d 219, 224, 144 Cal.Rptr. 145 (1978). "The issue of whether an arrest was made with reasonable cause is an issue of law to be decided by the court." *Id.* at 225, 144 Cal.Rptr. 145.

For the reasons set forth in section I.D., *supra,* defendants had reasonable cause to believe the Joshua Treadway's and Aaron Houser's arrests were lawful. Therefore, California Penal Code § 847 shields defendants from liability for Joshua Treadway's and Aaron Houser's arrests. Accordingly all of the defendants are entitled to summary judgment with respect to Joshua Treadway's and Aaron Houser's claims for false arrest/false imprisonment.

### B. Michael Crowe's Claim

Defendants Wrisley, Claytor and Anderson do not seek summary judgment with respect to Michael Crowe's claim for false arrest/false imprisonment. Defendants Blum, McDonough and Sweeney do seek summary judgment with respect to Michael Crowe's false arrest/false imprisonment claim, although they do not base their motion on the ground that there was probable cause to arrest Michael Crowe. The court now turns to their arguments.

Defendant Blum moves for summary judgment on the ground that he did not arrest the boys. It is undisputed that defendant Blum did not arrest the boys. However, because plaintiffs are attempting to proceed under a conspiracy theory, the court must determine whether there is a genuine issue of material fact as to whether defendant Blum was a member of the conspiracy alleged by plaintiffs. Because this is a state law claim, the court looks to state conspiracy principles.

■ Under California law, civil conspiracy "is not a tort but rather a theory of joint liability whereby all who cooperate in another's wrong may be held liable." *Thompson v. California Fair Plan Ass'n,* 221 Cal.App.3d 760, 767, 270 Cal.Rptr. 590 (1990). *See also 117 Sales Corp. v. Olsen,* 80 Cal.App.3d 645, 649, 145 Cal.Rptr. 778 (1978) ("The advantage to the pleader in charging a conspiracy is to implicate all participating in the common design and thus fasten liability on him who agree to the plan to commit the wrong as well as on him who carried it out.") "To be entitled to a joint recovery of damages against the defendant for inflicting a wrong through a conspiracy, the plaintiff must allege and prove: a concert of action between the defendants to accomplish the purpose of the conspiracy; that their actions were illegal and in futherance of a common scheme or design to achieve the unlawful

purpose of the conspiracy; and their knowledge of the conspiracy and its unlawful purpose." *James v. Herbert,* 149 Cal. App.2d 741, 747, 309 P.2d 91 (1957). Liability for a civil conspiracy "attaches only for action taken pursuant to the conspiracy." *Thompson,* 221 Cal.App.3d at 767, 270 Cal.Rptr. 590.

"Because civil conspiracy is so easy to allege, plaintiffs have a weighty burden to prove it." *Choate v. County of Orange,* 86 Cal.App.4th 312, 333, 103 Cal.Rptr.2d 339 (2000). As the California Court of Appeal has explained:

> It is not enough that the conspiring officers knew of an intended wrongful act, they must agree-expressly or tacitly-to achieve it. Unless there is such a meeting of the minds, " 'the independent acts of two or more wrongdoers do not amount to a conspiracy.' " (*National Congress for P.R. Rights v. City of New York* (S.D.N.Y.1999) 75 F.Supp.2d 154, 168.). "Bare" allegations and "rank" conjecture do not suffice for a civil conspiracy. (*Mahaney v. Warren County* (8th Cir.2000) 206 F.3d 770, 772.)

*Choate,* 86 Cal.App.4th at 333, 103 Cal. Rptr.2d 339.

▮ As noted in section I.A., *supra,* plaintiffs allege that there was a "common objective to convict and incarcerate the boys" and that defendant Blum was a part of this "scheme to blame and punish the boys" for Stephanie's murder. *See* Plaintiffs' Memorandum of Points and Authorities in Opposition to Lawrence N. Blum's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment p. 7:3–4 and 8–9. According to plaintiffs, the objective of the conspiracy was to be accomplished by means of illegal interrogations, arrests, searches, and seizures.

Here, although defendant Blum participated in the interrogation of the boys, there is absolutely no evidence that he was even aware of the alleged conspiracy or its objectives, let alone that he was a part of this conspiracy. Because participation in a conspiracy "is difficult to prove by direct evidence, it can be inferred from the nature of the act done, the relation of the parties, the interest of the alleged conspirators, and other circumstances." *Black v. Sullivan,* 48 Cal.App.3d 557, 566–567, 122 Cal.Rptr. 119 (1975). However, none of these factors suggest defendant Blum's participation in the alleged conspiracy.

First, defendant Blum did not have a prior relationship with the other defendants from which one could infer that he was a participant in the alleged conspiracy to wrongfully arrest the boys or that he would have any interest in participating in a conspiracy which, plaintiffs contend, was directed at protecting Officer Walters and the Escondido Police Department from criticism.

Second, the alleged wrongful acts which directly support this claim—the arrests of the boys—are in the nature of a police function and are acts that defendant Blum himself did not perform. The act which defendant Blum did perform was the provision of professional advice regarding how best to interrogate a suspect. One cannot infer from the limited nature of this act that defendant Dr. Blum was a participant in a greater conspiracy to "convict and incarcerate" by means of an illegal arrest.

Finally, it should be emphasized that even if by giving the advice he gave, defendant Blum violated the boys' Fifth Amendment rights (which the court has concluded he did not), to be held liable for false arrest/false imprisonment, the evidence must disclose not only that defendant Blum's actions were illegal but that his conduct was "in furtherance of a common agreement or understanding to achieve the unlawful purpose of" the Escondido defendants. *See Angelus Securities Corp. v. Ball,* 20 Cal.App.2d 423, 432,

67 P.2d 152 (1937) (for defendants to be held liable under a conspiracy theory "the evidence must disclose not only that their actions in selling their stock and receiving corporate securities in exchange therefor was illegal, *but that the conduct of [the defendants] was in furtherance of a common agreement or understanding to achieve the unlawful purpose of the directors who negotiated the stock purchase.*") (emphasis added). As stated, there is simply no evidence that defendant Blum's participation in the interrogation of Michael Crowe, whether constitutional or not, was in furtherance of a common agreement or understanding to achieve the alleged unlawful purpose of the Escondido defendants in pursuing the arrests and prosecution of the boys.

Because no reasonable factfinder could find that defendant Blum was a participant in the alleged conspiracy, defendant Blum is entitled to summary judgment with respect to the boys' false arrest/false imprisonment claim. *See Id.* (trial court properly granted nonsuit where there was no evidence that the defendants were aware of the purpose of the alleged conspiracy and that their actions were in furtherance of an agreement to achieve the unlawful purpose of the alleged conspiracy). Because he is entitled to summary judgment on this ground, the court need not determine whether California Civil Code § 47(b) and (c) also provide a defense to this claim.

■ Defendant McDonough, like defendant Blum, is entitled to summary judgment with respect to all of the boys' claims for false arrest/false imprisonment. As with defendant Blum, plaintiffs seek to hold defendant McDonough liable under the theory that he was a participant in a "conspiracy to wrongfully convict and incarcerate the boys for Stephanie's murder" in order to protect Officer Walters and the Escondido Police Department from the ramifications of Officer Walter's alleged failure to stop the murder of Stephanie Crowe. Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Chris McDonough's Motion for Summary Adjudication/Judgment as to all Claims by Michael Crowe, Aaron Houser and Joshua Treadway p. 13:24–25. As with defendant Blum, there is no evidence from which it can be inferred that defendant McDonough was a member of such a conspiracy.

There is no evidence that defendant McDonough had a prior relationship with the Escondido defendants that would give him an interest in joining such a conspiracy, and there is no other evidence from which a reasonable factfinder could infer that he would have any interest in participating in such a conspiracy. It is undisputed that defendant McDonough, who is employed by the City of Oceanside, not the City of Escondido as are the other police officer defendants, was asked by the City of Escondido to assist in the interrogations of the boys because of his training using the CVSA, a machine which is sold as a "truth verification" device. This was the first time that defendant McDonough had been contacted by the City of Escondido to assist with an interrogation, and defendant McDonough had no other significant contacts with the Escondido defendants.

Moreover, although one could infer that defendant McDonough conspired with the Escondido defendants to coerce a confession from the boys, one cannot reasonably infer from his membership in this smaller conspiracy that McDonough was aware of and was a participant in a grand conspiracy to wrongfully arrest and prosecute the boys. Because there is no evidence from which a reasonable factfinder could infer that defendant McDonough was aware of the alleged conspiracy to wrongfully convict and incarcerate the boys, let alone that he was a member of it, defendant McDonough is entitled to summary judg-

ment with respect to the boys' false arrest/false imprisonment claims.

■ Defendant Sweeney moves for summary judgment on the ground that he did not specifically participate in the boys' arrests. However, defendant Sweeney fails to address the boys' conspiracy allegations. Because defendant Sweeney has failed to demonstrate that there is no genuine issue of material fact as to whether he was involved in the alleged conspiracy, defendant Sweeney's motion is denied with respect to this claim.

## VIII. Eleventh and Twelfth Claims for Relief—Intentional and Negligent Infliction of Emotional Distress

■ All of the plaintiffs bring California state law claims against defendants Blum, Wrisley, Sweeney, Claytor, McDonough and Anderson for intentional and negligent infliction of emotional distress. It appears that these claims, like plaintiffs' claims for violation of the Fourteenth Amendment substantive due process clause, are predicated upon the interrogation and "strip searches" of the boys.

California Gov't Code § 821.6 provides that "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Although not apparent from the language of the statute, the California Court of Appeal has held that § 821.6 "is not limited to the act of filing a criminal complaint. Instead, it also extends to actions taken in preparation for formal proceedings." *Amylou R. v. County of Riverside,* 28 Cal.App.4th 1205, 1209–10, 34 Cal.Rptr.2d 319 (1994). "Because investigation is 'an essential step' toward the institution of formal proceedings, it 'is also cloaked with immunity.' " *Id.* at 1210, 34 Cal.Rptr.2d 319 (cit-

ing *Kemmerer v. County of Fresno,* 200 Cal.App.3d 1426, 1436–37, 246 Cal.Rptr. 609 (1988)). Thus, § 821.6 shields police officers from claims for emotional distress arising out of a criminal investigation. *See Amylou R.,* 28 Cal.App.4th at 1214, 34 Cal.Rptr.2d 319.

In *Amylou R.,* the plaintiff sued a county, contending that the actions of its officers in investigating a murder were tortious and constituted, *inter alia,* the intentional and negligent infliction of emotional distress. The plaintiff had told police that she and her friend were abducted and raped, and that her friend was killed by the abductor but that she had been released. The police began to grow suspicious of her story and, according to the plaintiff, began telling her that she knew that she was lying and that if she refused to tell the truth they would tell everyone they knew she was lying, which would result in the loss of her friends. After the plaintiff refused to cooperate with police, they began questioning her friends and neighbors, telling them that the plaintiff was lying and suggesting that she was not a victim and was involved in the murders.

On appeal, the court concluded that officers were immune under § 821.6 because the acts of which the plaintiff complained "are incidental to the investigation of the crimes, and since investigation is part of the prosecution of a judicial proceeding, those acts were committed in the course of the prosecution of that proceeding." *Id.* at 1211, 34 Cal.Rptr.2d 319. It also concluded that this immunity is not limited to claims for injuries suffered by the target of the investigation but also shields officers from liability for injuries suffered by others. It then concluded that because the officers were immune under § 821.6, the county was immune pursuant to Gov.Code § 815.2(b), which provides that "[e]xcept

as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

Here, as in *Amylou R.*, the acts giving rise to plaintiffs' claims—the interrogations and "strip searches" of the boys—are incidental to the investigation of a crime. Because, as determined by the court in *Amylou R.*, investigation of a crime is part of the prosecution of a judicial proceeding, defendants are entitled to immunity pursuant to § 821.6. Plaintiffs have failed to even attempt to distinguish *Amylou R.*, which the court finds to be directly on point. Moreover, plaintiffs' reliance on *County of Los Angeles v. Superior Court of Los Angeles Court*, 78 Cal.App.4th 212, 92 Cal.Rptr.2d 668 (2000) for the proposition that § 821.6 only shields officers from liability for damages suffered after the judicial process begins is unavailing.

Unlike the plaintiff in *Amylou R.*, the plaintiffs in *County of Los Angeles* brought a claim for false arrest and false imprisonment, and unlike in *Amylou R.*, the issue in *County of Los Angeles* was the correct measure of damages in a false arrest/false imprisonment case. In the course of addressing this issue, the court of appeal had to determine how the immunity granted by § 821.6 affects the measure of damages in a false arrest/false imprisonment claim. Although California courts have refused to construe § 821.6 as providing immunity for false arrest or false imprisonment, *see Sullivan v. County of Los Angeles*, 12 Cal.3d 710, 720, 117 Cal.Rptr. 241, 527 P.2d 865 (1974), a false arrest/false imprisonment claim ends at the time an individual is arraigned, *see County of Los Angeles*, 78 Cal.App.4th at 221, 92 Cal.Rptr.2d 668, and once an individual is arraigned, the claim becomes one for malicious prosecution, a claim for which § 821.6 provides immunity. *See id.* at 217,

92 Cal.Rptr.2d 668. The trial court in *County of Los Angeles* held that the plaintiffs could only recover damages for false arrest/false imprisonment for the period of time between their arrest and the time the district attorney filed a criminal complaint against them. The court of appeal disagreed. Distinguishing between injuries and damages, the court of appeal explained that although the plaintiffs were only entitled to recover for injuries incurred up until the time the criminal complaint was filed, if those injuries resulted in damages that accrued after the filing of the criminal complaint, such damages were recoverable.

*County of Los Angeles* is not on point with respect to the present claim, as it did not involve a claim for intentional or negligent infliction of emotional distress arising out of a police investigation but instead involved a damages issue raised in the context of a claim for false arrest/false imprisonment. Moreover, not only is *County of Los Angeles* not on point, but nothing in that opinion suggests *Amylou R.* is not good law for the proposition for which it is cited here. Because the holding of *County of Los Angeles* is inapplicable here, and because *Amylou R.* is directly on point, defendants' motions for summary judgment are granted with respect to the boys' claims for intentional and negligent infliction of emotional distress.

## CONCLUSION

By its ruling, the court does not intend to minimize the pain that plaintiffs, particularly the Crowe plaintiffs, experienced not only from the tragedy of Stephanie's death but from defendants' actions. However, assuming for the moment that the boys were not involved in Stephanie's death, it is vital to note that "[t]he Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983

would provide a cause of action for every defendant acquitted—indeed, for every suspect released." *Baker,* 443 U.S. at 145, 99 S.Ct. 2689. As recognized by the Fourth Circuit,

> not every unfortunate incident gives rise to § 1983 liability against a municipality or its officials. The police must be held to standards of reasonableness, not to standards of perfection. A society that expects police officers to provide protection must afford them in turn some protection from lawsuits. If immunity is lost in every case of mistaken arrest, then many a perpetrator of violent crime will go unapprehended.

*Torchinsky v. Siwinski,* 942 F.2d 257, 264–5 (4th Cir.1991).

For the reasons set forth in the body of this Order,

Defendant Blum's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment [# 508–1 and –2] is granted.

Defendant Stephan's Motion for Summary Judgment [# 586–1] is granted. Defendant Stephan's Special Motion to Strike [# 586–2] and Request for Attorney Fees and Costs [# 586–3] are denied as moot.

Defendant McDonough's Motion for Summary Judgment of the Claims Asserted by Plaintiffs Stephen Crowe, Cheryl Crowe, Judith Kennedy, Shannon Crowe, Margaret Houser, Gregg Houser, Michael Lee Treadway, and Tammy Treadway [doc.# 500] is granted. Defendant McDonough's Motion for Summary Adjudication/Judgment as to All Claims by Michael Crowe, Aaron Houser and Joshua Treadway [# 538–1 and –2] is granted.

The City of Oceanside's Motion for Summary Judgment of the Monell Claims Asserted by All Plaintiffs [# 469] is granted.

The City of Escondido's Motion for Summary Judgment of the Claim Asserted by Michael Crowe [# 494] is granted.

Defendant Barry Sweeney's Motion for Summary Judgment or in the Alternative Partial Summary Judgment [# 389–1 and –2] is granted in part and denied in part. Specifically, it is granted with respect to all claims except the Crowes' Fourth Amendment claims, the Crowes' claims for violation of the right to companionship, and Aaron Houser's claim for defamation.

Escondido Defendants' Motion for Summary Judgment or in the Alternative Partial Summary Judgment, of the Claims Asserted by the Treadway Plaintiffs [# 488–1 and –2] is granted.

Escondido' Defendants' Motion for Summary Judgment or in the Alternative, Partial Summary Judgment, of the Claims Asserted by the Houser Plaintiffs [# 448–1 and –2] is granted.

**IT IS SO ORDERED.**